173 N.J. Super. 333 (1980)
414 A.2d 291
STATE OF NEW JERSEY, PLAINTIFF,
v.
PAUL HURD, DEFENDANT.
Superior Court of New Jersey, Law Division, Somerset County.
Decided April 2, 1980.
*335 Leo Kaplowitz for defendant (Kaplowitz and Wise, attorneys).
*336 Robert D. Clarke, Assistant Prosecutor, for the State of New Jersey (David Linett, Somerset County Prosecutor, attorney).
DIANA, J.S.C.
This is essentially a defense motion on 14th Amendment grounds to suppress a proposed in-court identification of defendant by the victim of a knife attack.
Pursuant to R. 3:13-1(b), and with consent of counsel, the hearing to determine the admissibility of the identification was held prior to the selection of a jury.
The basis of the challenge to the proposed in-court identification is that it is unreliable since the victim was unwilling or unable to identify defendant as her attacker following the incident and did so only after the improper importuning of law enforcement officers and an impermissibly suggestive hypnotic session, 21 days after the attack.
More particularly, defendant contends there is insufficient medical or scientific data to establish that testimony elicited through hypnosis is reliable and that acknowledged experts insist that such testimony is unreliable. Further, defendant contends that there is no precedent in this State for the admissibility of an identification allegedly induced by a hypnotic trance. Defendant further argues that even if it be held that identifications induced by hypnosis are not per se inadmissible, the facts of this case reveal that the process was so impermissibly suggestive as to taint the identification and render it inadmissible.
The issue may be stated as follows:
Can the victim of a crime be allowed to make an in-court identification of her attacker when she was unwilling or unable to make an identification until she submitted to a pretrial hypnotic procedure? A resolution of that question involves a consideration of a number of other issues:
(1) Is hypnosis a sufficiently reliable procedure to justify its use as a memory refreshener in litigation?
(2) Were the methods used and circumstances under which the hypnotic session was conducted unnecessarily suggestive so as to require suppression of the *337 in-court identification even if memory refreshed by hypnosis is not per se inadmissible?
(3) Whether, under the totality of the circumstances, the identification was reliable even if it be found that the hypnotic procedures employed were suggestive?
The essential facts of this case are that at or about 5:45 a.m. on June 22, 1978 Jane Sell was attacked as she slept in her ground floor apartment bedroom, suffering numerous serious knife wounds. Mrs. Sell occupied the apartment with her present husband, David Sell, and her three sons, two of whom were by her prior marriage to defendant, Paul Hurd. On the preceding evening, David Sell had fallen asleep on the couch and Mrs. Sell was alone in her bed at the time of the attack. There were no lights on in the bedroom, the curtains were drawn and the venetian blind was halfway down on the only window in the room. There is no evidence that the attacker sought to rob or sexually assault the victim.
Following the attack Mrs. Sell was unable or unwilling to identify her attacker, but in the hospital on the day of the attack she told police officers to "check out" her former husband, Paul Hurd.
Mrs. Sell did have two recollections of the attack which the police believe to be inconsistent. At one point she indicated the attacker approached her from the area of the dresser, which was located on a wall opposite the window, while on another occasion she stated the attacker entered from the window. There was also reference by Mrs. Sell to a "stranger." An investigation of the crime was commenced by the North Plainfield Police Department and the Somerset County Prosecutor's Office. The principal participants in the early investigation were Officers Van Winkle and Gilbert of the North Plainfield Police Department and Detective Pierangeli of the Somerset County Prosecutor's Office. From the inception of the investigation the police held the view that there were two possible suspects, the primary suspect being the victim's former husband, Paul Hurd, and the *338 other her present husband, David Sell. Although separated for over seven years, Mrs. Sell and her former husband continued to argue over financial and visitation matters, the most recent argument having occurred over the telephone the night before the attack in a conversation between Paul Hurd and David Sell.
At the suggestion of the Prosecutor's Office, or her husband, David Sell, or both, Mrs. Sell was convinced to undergo hypnosis in an attempt to improve her recollection of the incident, more particularly to identify her assailant.
Again, at the initiation of the Prosecutor's Office, Dr. Herbert Spiegel, a psychiatrist and acknowledged authority on hypnosis, was retained to conduct the hypnotic procedure, which took place in New York City on July 14, 1978. Both Detective Pierangeli and Dr. Spiegel tape recorded portions of the session. During this session five persons were in the doctor's office: the doctor, Pierangeli, Lieutenant Van Winkle, Mrs. Sell and a physician studying under Dr. Spiegel. David Sell, Mrs. Sell's husband, had accompanied her to New York City but waited in an outer office during the session.
While in a hypnotic trance Mrs. Sell was directed to relive the event (abreact) and was questioned about the details of the attack. In response to questions Mrs. Sell recounted the events and partially described the clothing and some features of her attacker. Mrs. Sell then commenced to cry hysterically. At that point Pierangeli asked Mrs. Sell if she knew the attacker. Mrs. Sell replied, "Yes." Pierangeli asked, "Is it David?" Mrs. Sell replied, "No." Pierangeli then asked, "Is it Paul?" Crying hysterically Mrs. Sell replied, "Yes." When Mrs. Sell was taken from the hypnotic trance to a so-called post-hypnotic state, there was further conversation between Mrs. Sell, Dr. Spiegel and the police officers during which Dr. Speigel and the officers sought to encourage Mrs. Sell to make an identification. Pierangeli continued to urge Mrs. Sell to verbalize the identification at dinner following the session.
*339 Among the remarks made to Mrs. Sell by Pierangeli and Dr. Spiegel following the hypnotic procedure were several to the effect that unless she identified her attacker he would remain free to attempt to attack again, and that should a subsequent attack prove successful her children would be without a mother. Further, they urged that by not making an identification her current husband, David Sell, could not be eliminated as a suspect. It should also be noted that David Sell had voluntarily submitted to one or more polygraph examinations shortly after the attack. There was brief reference to the effect that these tests failed to eliminate him as a suspect, although the result of these tests was not admitted into evidence.
On July 20, 1978 Mrs. Sell, accompanied by her husband, David Sell, appeared at the North Plainfield Police Department where she made a tape-recorded, later transcribed statement in which she first described her attacker and then identified her former husband, defendant Paul Hurd, as her attacker. In the following month defendant was indicted and charged with assault with intent to kill, atrocious assault and battery, assault with a deadly weapon, possession of a dangerous knife and breaking and entry with intent to assault.
Although we have found no reported cases in New Jersey dealing with the use of hypnotically induced recall for trial purposes, several decisions in federal courts and other jurisdictions have considered these issues. Annotation, "Admissibility of Hypnotic Evidence at Criminal Trial," 92 A.L.R.3d 442 (1979). In this case we are primarily concerned with the issues relating to the use of hypnosis to refresh the recollection of a witness.
Our starting point must be an attempt to describe the hypnotic phenomenon, its uses and its limitations as explained by the expert witnesses. We must then examine the procedures employed in this case by those persons involved in the evidence-gathering process.
*340 As defined by the State's expert, Dr. Herbert Spiegel, a hypnotic state is a heightened or intense state of concentration which enables the subject to recall past events that for a variety of reasons the subject was unable to remember. According to Dr. Spiegel, a substantial percentage of the population has the capacity to be hypnotized; however, this capacity differs in degree in each individual. The significance of this difference in capacity is that persons with greater capacity for or susceptibility to hypnosis may be more responsive to hypnotic suggestion or requests than those with lesser capacity or susceptibility. Dr. Spiegel testified that he had developed a clinically acceptable method to quickly measure an individual's capacity to achieve a hypnotic state, which he called the "Hypnotic Induction Profile." He contends that the previously accepted test for measuring capacity, known as the "Stanford Scales," have recently been questioned by one of the psychiatrists who developed those scales. Dr. Spiegel's Hypnotic Induction Profile employs a rating or grading from 0 to 5, with 0 representing a virtual inability to experience hypnosis and 5 representing the maximum capacity to experience hypnosis. In this instance he had classified Mrs. Sell as a 2 to 3 range individual which he defined as "mid range."
As explained by Dr. Spiegel, to achieve the objective of assisting a person to remember a specific past event or series of events, the hypnotic process seeks to reduce the subject's usual peripheral awareness of vast amounts of information, thus enhancing the subject's ability to devote full attention and concentration to a specific event or series of events which took place in the past. In addition, if the specific event or series of events was unanticipated and was particularly catastrophic, and the subject develops an amnesia to the event (a condition he described as traumatic neurosis), the hypnotic process can be employed to convince the subject that he or she no longer needs the protection of amnesia and can relive the experience in safety and can recall the events. Dr. Spiegel expressed the opinion *341 during the hearing that Mrs. Sell had suffered a traumatic neurosis by virtue of the unanticipated catastrophic nature of the attack.
Dr. Spiegel defines traumatic neurosis as an unexpected or unanticipated catastrophic assault on the ego resulting in a breakdown of the usual sense of executive control that one normally possesses. The consequence of the breakdown in executive control is a partial or total amnesia to the trauma itself. Individuals suffering this trauma will insist he or she does not remember the event; however, when they recover from the neurosis they realize that they did remember the event but did not or could not verbalize the incident. The objective of hypnotic treatment for the condition is to convince the patient that she can separate the memory of the catastrophe from the catastrophe itself, and when this is accomplished the patient no longer finds it necessary to maintain the protection of amnesia. This treatment requires that the psychiatrist create an atmosphere of protection and support so that the patient feels she can relive the experience in safety. Frequently the patient will try to avoid remembering, and the therapist must encourage, if not force, the patient to relive the event. During this process the patient will often correct previous recollections made at the time the terror of the event distorted her perception of the event.
Dr. Spiegel believes that Mrs. Sell's failure to have identified her attacker immediately after the attack even though she knew his identity is totally consistent with the condition of traumatic neurosis. In his view, under the circumstances of this case it was natural for her to have been overcome by her terror and by her natural concern for self-preservation, and to have lacked the composure to give specifics concerning the attack. When, through hypnosis, she was relieved of the traumatic neurosis, she was able to achieve a restoration of her usual memory facilities and was able to recall what she saw.
Dr. Spiegel summarized his opinion of what had occurred to Mrs. Sell with the following statement:

*342 I think that Mrs. Sell compressed the panic of pending annihilation with the memory of it. Thus, she became psychiatrically crippled with an acute traumatic neurosis.
When in an atmosphere of security with the physician  myself, and the police, she was able to re-experience the assault with the enhanced concentration of hypnosis and was, thus, able to disconnect the horror of the event from the memory of it, getting a historical, perspective. This enabled her to recall details and remember the assault sequence with her customary critical faculties which had been paralyzed by the traumatic neurosis. Thus, for the first time since the attack was she able to recall and report about it subjectively with her full executive control and conscience. Her reduced ego functioning with amnesia, recurrent nightmares, irritability and tendency for emotional outburst was in fact contained and reversed with the subsequent ego rehabilitation and I might say even a cure of her traumatic neurosis, which led her to reach her previous level of ego integration. Her pre-assault level of ego integration. And this I think is significantly different from simply using hypnosis alone to recall less emotionally charged events. When her ego integrity is intact and unchanged before, during and after the hypnotic  or when the ego integrity of a person is intact and unchanged before, during the after the hypnotic experience, that is a different domain than the one we are considering here when we are releasing somebody from a crippled emotional state.
At one point in his testimony Dr. Spiegel viewed his efforts with Mrs. Sell as primarily therapeutic, namely, attempting to treat her traumatic neurosis. He insists that the procedure used was not coercive or suggestive and that both during and following the hypnotic trance she was given options as to remembering or not remembering and as to what she could remember.
Dr. Spiegel acknowledged the limitations of hypnosis as a truth-seeking technique. He testified that it was possible to implant in the mind of a grade 5 subject while in a hypnotic trance a completely false notion or idea, which the subject would, for a short period following the trance, accept and innocently espouse as absolute truth. Additionally, he testified that by subtle suggestions a hypnotist could cause the subject to recount or recall events in a manner sought by the hypnotist. Dr. Spiegel was of the opinion that the procedure followed by *343 him as well as the officers present was completely free from seduction, suggestion, coercion or taint of any kind and that the recollections expressed by Mrs. Sell were completely authentic. He emphasized that Mrs. Sell, suffering a traumatic neurosis and being a mid-range subject, was not susceptible to suggestion or coercion.
Defendant offered the testimony of Dr. Martin Orne, an equally qualified and recognized psychiatrist, who also had devoted over 20 years to the study of hypnosis. In his testimony Dr. Orne also described the phenomenon of hypnosis, numerous past laboratory hypnotic experiments and the various conclusions drawn from these experiments. The major premise of Dr. Orne's testimony is that hypnotic recall is often unreliable by reason of the factors inherent in the nature of hypnosis and the properties of the human memory system.
Dr. Orne first attacked the validity of Dr. Spiegel's Hypnotic Induction Profile (HIP) as a valid assessment of the extent of a subject's hypnotizability. Dr. Orne testified that laboratory experiments undertaken to test the validity of Dr. Spiegel's profile failed to support his (Dr. Spiegel's) thesis and established that the profile was unreliable and inadequate for use as a method to measure hypnotic susceptibility as compared with what Dr. Orne believed to be the generally accepted so-called "Stanford Scales." The significance of this dispute is that if Dr. Spiegel, by using his Hypnotic Induction Profile, failed to properly assess Mrs. Sell's susceptibility to hypnosis, then any conclusions, especially as to the absence of suggestivity in the hypnotic session, may be questioned.
According to Dr. Orne, a widely used hypnotic technique is what is termed "age regression" which appears to enable an individual to relive some past event that might have occurred years ago or a more recent event that involves some trauma motivating the subject to forget the incident.
The age-regressed individual will often appear to spontaneously, and sometimes emotionally, elaborate details which apparently *344 could only be brought forth by someone actually observing the events as they transpired. Dr. Orne insists, however, that laboratory studies establish that much of what is allegedly recalled is not historically accurate. In his view, the hypnotic suggestion to relive a past event, particularly when accompanied by questions about specific details, puts pressure on the subject to provide information for which there are few, if any, actual memories. This situation may jog the subject's memory and produce some increased "recalls," but it will also cause him to fill in details that are not actually recalled but consist of memories or fantasies from other times. Determining which details are facts and which have been confabulated is often difficult to establish. By reason of this frequent inability to distinguish fact from fiction, Dr. Orne felt it was essential that the subject's statements be independently verified before they can be accepted as reliable.
In Dr. Orne's view, the apparent increase in recall during deep hypnosis is the product of the subject's decrease in critical judgment. Thus, the subject is willing to accept approximations of memory as being accurate. Whereas in the wake state the subject is unwilling to accept these approximations, in hypnosis he alters his criterion of what is acceptable and brings forth fragments mixed with confabulation. At that time neither the subject nor the hypnotist can distinguish between confabulation and accurate recall, and the only way to determine which is which is by external corroboration. If, prior to hypnosis, the subject is told that following hypnosis he will be able to recall previously forgotten events, he will often awake and confuse his hypnotic memories with his waking memories. Instead of being able to differentiate between his earlier fragmentary recall, and the gaps he has filled in through hypnosis, he will now report both as his "memory," often with consistency and conviction.
It is Dr. Orne's belief that during hypnosis free narrative recall will produce the highest percentage of accurate information *345 but the lowest amount of detail, and conversely, the more extensively a subject is questioned about details during hypnosis, the more details will be obtained, but with a decrease in accuracy.
Dr. Orne expressed concern, based upon his belief, that if the hypnotic subject has obtained information about an event from comments made during or prior to an interrogation, he will incorporate this information in his memory, confusing it with his own memory of the event. This altered memory will tend to persist, and the more frequently the subject reports the events the more firmly established the altered memory becomes.
If a possibility exists that hypnotically-enhanced recall is to be used in court, Dr. Orne is of the opinion that a number of safeguards must be taken in order to reduce as much as possible the possibility of confabulation and fantasy being offered as memory. Thus, he would insist that hypnosis be carried out by a psychiatrist or psychologist trained in its use, who has not been verbally contacted prior to the session by the police. He would insist that any information about the crime given to the hypnotist be in written form. He would further require that any contact between hypnotist and the subject should be videotaped. Before induction of hypnosis he would require that the hypnotist obtain from the subject a detailed description of the facts as the subject remembers them, carefully avoiding adding any new elements to the witness' description of the events. Additionally, he would require that only the hypnotist and the subject be present before and during hypnosis. He would insist lastly that tape recordings of prior nonhypnotic interrogations be available for comparison and study to establish that the witness has not received information or suggestion which might later be reported as having been first described by the subject during hypnosis.
Among the conclusions to be drawn from Dr. Orne's testimony is that hypnosis, when properly conducted, may improve a subject's ability to recall past events to some degree. However, *346 regardless of the care exercised in conducting a hypnotic session, there is an inherent possibility in all hypnosis that the subject's statements could constitute intentional lies, confabulations or fantasies. It is also Dr. Orne's position that hypnotically-induced recollections cannot be accepted unless they can be verified by independent corroboration.
When asked to comment specifically upon the hypnotic, pre-hypnotic and post-hypnotic events in this case, Dr. Orne was highly critical. As he had previously observed, once a subject has become contaminated by suggestion or coercion, it cannot be reversed. In this case Dr. Orne contended that Mrs. Sell's perceptions had in fact been contaminated. Initially, he was disturbed that the pre-hypnotic interview and test for hypnotizability had not been recorded, since during this period a subject is also highly susceptible to suggestion, and without a record of these proceedings he could not assume that there was no contamination. Secondly, he was critical of the fact that David Sell, who was purportedly a suspect, was allowed to accompany the subject to this session. He felt that this would subconsciously have caused Mrs. Sell to eliminate David Sell as a suspect since she would have realized that the police would not have let her remain with him if he were a viable suspect (a thought actually expressed by Mrs. Sell during the post-hypnotic session). Thirdly, he found the questions by Detective Pierangeli during the session to be highly suggestive. He equates the sequence of questions by Pierangeli, to wit: "Is it someone you know?"  "Is it David?"  "Is it Paul?", to be tantamount to a statement to Mrs. Sell that her attacker was in fact Paul. He noted that Mrs. Sell viewed Pierangeli with affection and respect and would be greatly motivated to please the detective. In Dr. Orne's view, Pierangeli's prefatory statement to the effect that Mrs. Sell "had to help her" (Pierangeli) was, therefore, highly coercive. Contrary to the view expressed by Dr. Spiegel, Dr. Orne felt that Mrs. Sell was motivated to please Pierangeli to the same extent as she was motivated to please Dr. Spiegel, her hypnotist *347 (the subject's desire to please the hypnotist is apparently a recognized aspect of hypnosis).
Dr. Orne was equally critical of what transpired in the post-hypnotic session, again noting that the subject is equally susceptible to suggestion and coercion during that period. Dr. Orne contended that it was obvious from the transcript of the post-hypnotic session that Dr. Spiegel was convinced that Paul Hurd was the attacker. Dr. Orne feels it is equally obvious that Mrs. Sell was by no means certain of that identification. Furthermore, it is Dr. Orne's opinion that Dr. Spiegel conceived it to be his obligation to convince Mrs. Sell of the veracity of that identification. This conduct, in Dr. Orne's view, was therapeutically improper and added to the invalidity of the hypnotic procedure.
Dr. Orne observed that if Mrs. Sell's identification was confabulation, which he previously noted was at least as likely a probability as truth, the post-hypnotic conduct of Dr. Spiegel and Detective Pierangeli force Mrs. Sell to accept the identification as truth. He termed the entire procedure as highly coercive and therefore unreliable.
Dr. Orne also disagreed with Dr. Spiegel's diagnosis of traumatic neurosis in Mrs. Sell's case. In his opinion this condition is usually caused by conflicts which occur in the person's childhood, and a subsequent trauma, such as a war-time experience, reinstates the pre-existing difficulties. In Dr. Orne's view, neurosis is not the usual result of a traumatic event unless there was a pre-existing disorder. He also contended that when the repressed material comes to the patient's mind, it comes as an entire experience rather than emerging detail by detail, as occurred with Mrs. Sell. Although not conceding the diagnosis, Dr. Orne felt that if there was a traumatic event which was affecting Mrs. Sell, it was that she really didn't know who attacked her that morning, and not knowing created a far greater fear than the actual incident, since an unknown and undetected assailant could strike again. Had she known her *348 assailant, Dr. Orne felt she would have immediately identified him. He believes the fact that she did not identify her assailant is consistent with the fact that she could not identify him. In Dr. Orne's view, this is what was causing her obvious anxiety symptoms. He felt that her apparent improvement following hypnosis was the result of the fact that an identification had been made.
By reason of the highly suggestive procedure employed in the hypnotic and post-hypnotic session, Dr. Orne reasoned that Mrs. Sell was virtually coerced into making the identification she made.
To emphasize his theory that Mrs. Sell did not experience a true memory recollection, but rather confabulation produced by coercion or suggestion, Dr. Orne referred to the statement Mrs. Sell gave to the police some six days after the session. In that statement Mrs. Sell repeated almost verbatim the description she gave under hypnosis as to her attacker's hair, wrinkles, clothing and utterances, and concluded by saying that the "person I have just described, in my bedroom that morning, was my ex-husband, Paul Hurd." Dr. Orne felt that this unusual statement revealed that Mrs. Sell was merely reciting a superimposed memory which was the result of the way she had been influenced by Dr. Spiegel and Detective Pierangeli. It was Dr. Orne's opinion that had Mrs. Sell truly regained her memory, she would have merely stated that Paul Hurd had attacked her without first repeating the description given under hypnosis.
As a further example of Mrs. Sell's lack of critical judgment during the post-hypnotic discussions, Dr. Orne referred to the colloquy between Mrs. Sell, Pierangeli and Dr. Spiegel concerning defendant's remarriage. Jane Sell made several statements to the effect that defendant had remarried, to wit, "he got married right?" and "cause he married a very domineering woman, much like his mother" (he's under control). However, it has been represented that Hurd never remarried after his divorce from Mrs. Sell, Dr. Orne argued that Mrs. Sell's statements concerning the remarriage of defendant, which were *349 clearly counter to the facts, established her lack of critical judgment during the post-hypnotic discussions, at which time a great many suggestive comments were made.
Dr. Orne, after reading a transcript of Jane Sell's testimony in this hearing, found further evidence of his conclusions that Jane Sell was a highly hypnotizable subject and thus extremely vulnerable to suggestivity. He noted that when questioned on her recollection of what was said during the hypnotic session she had great difficulty in remembering. This, he feels, is highly indicative of her extensive hypnotizability.
Dr. Spiegel and Dr. Orne, despite the obvious differences in their positions in this case, agreed that hypnosis is a proveable phenomenon; that hypnosis can assist to some degree in memory refreshment, and that hypnosis has its greatest validity when used by psychiatrists in the treatment of patients since the truth of the memory is not essential in effecting a cure. Concerning the forensic use of hypnosis they agree upon the importance of independent verification of hypnotically-induced recollection, and the most we should legitimately expect from hypnotic interrogations is further data which may serve as leads for more conventional evidence gathering.
The second medical expert offered by defendant was Dr. Edward Lowell, a practicing psychiatrist with 21 years' experience in the field. Dr. Lowell, in preparation for his testimony, had listened to the tapes of the hypnotic and post-hypnotic sessions on his own equipment, making comparisons and corrections on the transcripts previously marked in evidence. He had also read the transcripts of the testimony of Drs. Orne and Spiegel and Mr. and Mrs. Sell. Dr. Lowell acknowledged that he did not use hypnosis in his practice but was generally familiar with its use in the treatment of patients. Dr. Lowell's ultimate conclusion was that by virtue of what had happened in the hypnotic and so-called post-hypnotic session there was such an impact upon Mrs. Sell's memory and sense of self that it was impossible to consider her a reliable witness at this point. He *350 felt she had been irretrievably rendered an unreliable witness. In his opinion, based upon the tapes and transcript, there was a grievous departure by Dr. Spiegel from fair medical practice. In addition, he concluded that the testimony of Dr. Spiegel to the effect that Jane Sell had suffered a traumatic neurosis was purely an afterthought which emerged during the trial. By reference to specific questions and statements appearing in the transcript of the hypnotic and post-hypnotic session, he sought to establish that Dr. Spiegel and Detective Pierangeli, intentionally or unintentionally, implanted in Mrs. Sell various fears, to wit: fear for her own safety, fear for the safety of her children, fear of being ungrateful to Pierangeli and fear of being a poor citizen. By further analysis of the questions and statements in the transcript, he felt that Dr. Spiegel, without adequate proof, concluded that Paul Hurd was the attacker, and although perhaps unintentionally, convinced Mrs. Sell of this belief. Dr. Lowell characterized the entire process as "coercive persuasion" resulting in an irrevocable contamination of the memory of Jane Sell.
Dr. Lowell diagnosed Mrs. Sell as an hysterical personality, the typical characteristics of which condition he enumerated as being highly susceptible to suggestivity, apprehensive and having a strong tendency to represent fantasy as though it were fact.
To support his conclusions, Dr. Lowell made several specific references to the transcript of the hypnotic and post-hypnotic session. He argued that Dr. Spiegel, commencing early in the session, injected information or conclusions for which there was no factual basis, i.e., information which had not been supplied by Mrs. Sell. Here Dr. Lowell referred to Dr. Spiegel's comments to Mrs. Sell, "it happened during the day?", "So there was light?", "You could see him?" In Dr. Lowell's opinion this began the contamination process and the supplying by Dr. Spiegel of *351 assumptions which had not originated with Mrs. Sell but which she commenced to accept as fact. Dr. Spiegel repeatedly suggested to Mrs. Sell that she should or could "imagine" certain things, or used leading questions like, "I assume you are eager to find out who did it, aren't you?" This created what Dr. Lowell described as a "set," giving permission to Mrs. Sell to imagine that which may not have been true. At one point Dr. Spiegel said to Mrs. Sell, "You are sitting at the foot of the bed," yet Mrs. Sell had never said she was sitting at the foot of the bed. Later Mrs. Sell accepted Dr. Spiegel's statement and stated that she was sitting. Dr. Lowell was critical also of the process by which Dr. Spiegel allowed Detective Pierangeli to inject herself at critical moments, especially the sequence of questions. "Is it someone you know?", "Is it David?", "Is it Paul?" He likened this to a line-up when a police officer would improperly point to one of the persons in the line-up and ask the victim, "Is it him?" In addition, this series of questions virtually eliminated for Mrs. Sell the possibility that it was some third person other than David or Paul. Dr. Lowell felt that the questioning of Mrs. Sell by Dr. Spiegel and Detective Pierangeli, created a demand quality whereby Mrs. Sell felt compelled to supply an answer even if there was no factual basis for her answer. It is Dr. Lowell's view that Dr. Spiegel communicated to Mrs. Sell his belief that Paul Hurd was the attacker by comments such as, "Your problem is you [meaning Mrs. Sell] don't want to believe," and "Why is it so difficult [for you, Mrs. Sell] to acknowledge this." Dr. Lowell also pointed to numerous remarks by Dr. Spiegel and Pierangeli which he characterized as "threats" to Mrs. Sell. Among those comments to Mrs. Sell were: "Don't you want to be protected from this?", "What would happen to your children if you were killed?", "She [Mrs. Sell] needs protection," "Is he [Paul Hurd] mentally unstable?", "If you don't say what you know you're doing an injustice to someone else," "Whose side are you on?"
*352 Dr. Lowell characterized this process as imploring Mrs. Sell to relax her uncertainty, which he stated was acceptable in treating a patient but fatal in a judicial setting.
In support of his opinion that Dr. Spiegel's diagnosis of Mrs. Sell as suffering a traumatic neurosis was an afterthought, Dr. Lowell referred to the taped conversation between Dr. Spiegel and the medical student after Mrs. Sell had left his office. Dr. Spiegel described to the student his analysis of what had occurred and never once mentioned traumatic neurosis. Dr. Lowell's experience has led him to the conclusion that traumatic neurosis accompanied by amnesia is extremely rare in civilian life. He concluded therefore, that had Dr. Spiegel believed Mrs. Sell's condition was a traumatic neurosis at the time, he would have been quick to so advise his student. Dr. Lowell also referred to Dr. Spiegel's September 1979 address to the New York Academy of Science in which he discussed the Hurd case and the memory recall he achieved with Mrs. Sell. Nowhere in that paper did Dr. Spiegel suggest that Mrs. Sell suffered a traumatic neurosis.
Dr. Lowell referred to several instances during the post-hypnotic session when Mrs. Sell made statements which were clearly contrary to the facts, which convinced him that she was confabulating and fantasizing. He referred to her statement that Detective Pierangeli had given a course at Somerset College which Mrs. Sell had attended. It was clear that Pierangeli had not given a course but rather had helped Mrs. Sell write a paper for the course. Dr. Lowell also referred to Mrs. Sell's statement that Paul Hurd had remarried. That defendant has not remarried is undisputed, yet Mrs. Sell clearly believed that he had. She even went so far as to describe the nonexistent wife as a "domineering woman, like his [Paul Hurd's] mother." Here, according to Dr. Lowell, Mrs. Sell was filling in her confabulation with additional information that was clearly nonexistent. Finally, Dr. Lowell noted that during this hearing Mrs. Sell had no recollection of conversation about defendant's alleged remarriage, despite the fact that the transcript irrefutedly established *353 that the conversation in fact took place. Mrs. Sell's statement concerning defendant's remarriage was not a delusion in Dr. Lowell's opinion, but was the result of what he characterized as tinkering and tampering with her memory by Dr. Spiegel and Detective Pierangeli.
Dr. Lowell felt the final absurdity was Mrs. Sell's testimony at this hearing that she knew all along that Paul Hurd had attacked her but was unable to openly accuse him or acknowledge this fact. He found this to be completely inconsistent with her post-hypnotic statements which reflected her inability to be certain of her attacker's identity.
Dr. Lowell criticized Dr. Spiegel's reliance on the Hypnotic Induction Profile. He observed that Dr. Spiegel acknowledged that his test was only 75% accurate. He noted that all psychiatrists' classifications were subject to a degree of error. His conclusion was that Dr. Spiegel's insistence that Mrs. Sell was a mid-range subject was at least debatable. Moreover, he observed that in discussing the interrogation with his student following the session, Dr. Spiegel himself observed that Mrs. Sell had reacted as "high" (referring to grade 5 as opposed to a mid-range 2 to 3).
Dr. Lowell also commented upon what he termed inconsistencies in Dr. Spiegel's testimony. Among his observations were that Dr. Spiegel initially claimed that his session with Mrs. Sell was an interrogation and that she was not a patient. Subsequently, after Dr. Spiegel described Mrs. Sell's condition as traumatic neurosis, he asserted that his work with Mrs. Sell was largely therapeutic. Dr. Lowell found the testimony of Jane Sell at this hearing as supportive of his premise that her identification of Paul Hurd was unreliable. His initial observation was that from her testimony he could conclude that she was emotionally disturbed, enormously confused and unable to use ego-functioning to resolve disparity. Among the inconsistencies and inaccuracies in her testimony he noted her insistence that she signed the July 20, 1978 statement in North Plainfield Police Headquarters although it was fairly obvious that it was signed *354 in the Prosecutor's Office. He also pointed out Mrs. Sell's insistence that she never mentioned Paul Hurd's name in Dr. Spiegel's office, whereas the transcript clearly establishes several such occasions. Dr. Lowell further noted Mrs. Sell's testimony that she remembered telling Dr. Spiegel that she could see a white shirt below the jacket length, when clearly she had not made that statement in Dr. Spiegel's office. In conclusion, Dr. Lowell observed that Mrs. Sell's obvious confusion during the hearing was a reflection of the extent to which her memory had been confused and contaminated by the hypnotic session.
The final expert offered by the defense was Dr. Lawrence Kolb, professor emeritus of the Columbia Presbyterian Medical School and an acknowledged authority in the field of psychiatry. In preparation for his testimony, Dr. Kolb had read the transcripts of the hypnotic and post-hypnotic sessions; however, he had not seen any of the other documents admitted in evidence nor had he read any transcripts of the testimony taken during the pretrial hearing.
Dr. Kolb defined traumatic neurosis as a condition produced by a life-threatening event which causes intense emotional disturbance, following which the victim will often relive the experience in the form of nightmares and even intrusion while awake. Other symptoms of the condition, according to Dr. Kolb, include flat responses, depression, hyper-alertness to situations which could evoke memories of the event, palpitations, hysterical paralysis and periods of amnesia. Contrary to the opinion of Drs. Orne and Lowell, Dr. Kolb believes the occurrence of traumatic neurosis is as prevalent in civilian life as in wartime situations. He specifically mentioned catastrophic fires, floods, vicious assaults, rapes and auto accidents as having the potential to produce a traumatic neurosis. In addition, he felt that a traumatic neurosis could occur without the pre-existence of a neurotic condition and that if amnesia occurs, it may occur immediately after the event. In his opinion both hypnosis and medication *355 are acceptable methods for treatment of traumatic neurosis although he and most psychiatrists prefer medication. He stated that the objective of treatment is to assist the patient to deal with reality; thus, one method of treatment is to attempt to encourage the patient to recall the traumatic event. Dr. Kolb also believes that the accuracy of the patient's recall is of some therapeutic importance; however, the fact that a patient feels better after an abreaction is not proof of the accuracy of his recollections. Dr. Kolb acknowledged that it is common for the patient to be inaccurate in his recollections of the traumatic event and to fantasize about the event. If the accuracy of the recall is in issue, Dr. Kolb believes it can only be established by independent or external corroboration. He feels it is well known that a patient abreacting a traumatic event frequently incorporates elaborations from internal fears and wishes and that, therefore, the statement made by the patient must be looked upon with caution.
Dr. Kolb was also asked to give his opinion concerning the conduct of the hypnotic and post-hypnotic session as well as Mrs. Sell's statements and reactions. He first observed that Mrs. Sell could have known the identity of her assailant at the time of the attack but have refused to identify him until she relived the event under hypnosis. He felt it was equally possible that she could have suffered a traumatic neurosis yet not have actually seen her assailant. In Dr. Kolb's opinion, if during the hypnotic session or while still under the influence of the hypnotist, a patient is advised or directed to act out or accept a hypothesis, the patient will subconsciously retain those directions or suggestions in her mind and carry them out at a later time. He observed that Mrs. Sell was strongly advised by Dr. Spiegel that she should recollect the events; that if she did so she would be performing a service to society, and if she failed to do so she was in essence perpetuating a lie. In Dr. Kolb's view, these urgings could be a factor in her conduct. Dr. Kolb also considered *356 remarks made by Dr. Spiegel and Detective Pierangeli to Mrs. Sell as virtually excluding all suspects except defendant.
Based upon his analysis of the transcript, Dr. Kolb was convinced that Mrs. Sell had not established reintegration during the post-hypnotic session. Dr. Kolb concluded that Mrs. Sell still had doubts and uncertainties about her recollection; nevertheless, she was subjected to comments and questions from Dr. Spiegel and Pierangeli that were designed to persuade her to make an identification. As he viewed it, it made little difference whether the leading questions and persuasion came from Pierangeli rather than Dr. Spiegel. Dr. Kolb concluded from certain remarks made by Mrs. Sell, such as her statement that defendant had remarried, that she had the capacity for substantial or sizeable fantasy. He also found unusual her July 20, 1978 statement to the police wherein she was uncertain as to the height of her former husband with whom she had lived for many years, describing him as somewhere between 5'6" and 5'11"."
Dr. Kolb's overall assessment was that Mrs. Sell had in fact suffered a traumatic neurosis by reason of the vicious attack on her life. Furthermore, he felt it was possible that she suffered an immediate amnesia to the event which she relived through the hypnotic session. However, he found Mrs. Sell to be a person capable of sizeable fantasy. Dr. Kolb also felt that Mrs. Sell was subjected to substantial pressure from Dr. Spiegel and Detective Pierangeli to make an identification of Paul Hurd, at a time when she expressed considerable doubts and uncertainty as to the identity of her attacker. Although Dr. Kolb was reluctant to criticize Dr. Spiegel's conduct as it concerned treatment of a patient who suffered a traumatic neurosis, he was emphatic in his view that the recollections expressed by Mrs. Sell could not be relied upon as accurate without independent corroboration. Dr. Kolb concluded his remarks with the observation that the vast majority of psychiatrists would have some doubts about the validity of recollection produced by hypnosis.
*357 As previously noted, there is no reported decision in New Jersey dealing with the issues raised in this case. A canvas of the reported decisions in other jurisdictions in which the admissibility of hypnotic evidence was in issue reflects a limited judicial acceptance. Annotation, supra, 92 A.L.R.3d 442 (1979).
There are two broad categories of cases in which hypnotic evidence is likely to be offered. The first such category includes those cases wherein an accused seeks to offer hypnotic evidence relating to his or her alleged innocence. The second category encompasses cases in which the prosecution seeks to produce a witness whose memory has allegedly been refreshed by hypnosis. For the most part, hypnotic evidence has been held inadmissible when it is offered by a defendant to show his innocence. However, the courts have been considerably more receptive to offers of testimony allegedly induced by hypnosis. Since the case at bar is clearly within this second category, this opinion will be limited to such cases. Annotation, supra, 92 A.L.R.3d 442 (1979).
In general, the attitude of the courts seems to be that the admissibility of this type of evidence should be left to the sound discretion of the trial judge. 92 A.L.R.3d 442, § 2a. Courts in other jurisdictions have demonstrated some willingness to accept testimony of a witness hypnotized prior to trial for the purpose of refreshing his or her memory. Thus, in the case of United States v. Awkard, 597 F.2d 667, 669 (9 Cir.1979), the court noted that "pretrial hypnosis of witnesses is permitted in this circuit in both criminal and civil cases." The court noted that the use of hypnosis affects the credibility but not the admissibility of the evidence. In the earlier case of Creamer v. State, 232 Ga. 136, 205 S.E.2d 240 (1974), the Georgia Supreme Court allowed the testimony of a woman who had been hypnotized prior to trial in an attempt to assist her to remember the details of two killings which she had allegedly forgotten due to the lapse of time and her use of amphetamines. The court held that the reliability of *358 hypnosis had not been established and that the statements made by the woman while she was actually under hypnosis were not admissible. However, the court reasoned that the hypnotic session had not so tainted the witness' testimony so as to render it inadmissible. Similarly, in Harding v. State, 5 Md. App. 230, 246 A.2d 302 (App.Ct. 1968) certif. den. 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1968), it was held that the hypnotically-induced memories of the victim of an assault were admissible. The facts of the Harding case are similar to those of the case at bar. In Harding a woman was shot and sexually assaulted. While she was still in the hospital the victim gave three conflicting stories to the police as to how the assault occurred. She was hypnotized, and while in the trance she narrated the circumstances surrounding the crime. After being brought out of the trance she repeated the same version she had given under hypnosis, and at trial she stated that her testimony was based upon her own recollection. The court found that the fact that she was able to recollect the incident only after being hypnotized was relevant to the weight rather than the admissibility of the testimony. Furthermore, the psychologist who had actually hypnotized the victim was permitted to testify as to the reliability of her hypnotically-induced memories. In the same vein is State v. McQueen, 295 N.C. 96, 244 S.E. 2nd 414 (Sup.Ct. 1978), where it was held that the fact that a witness' memory was refreshed through hypnosis prior to trial affects the credibility and not the admissibility of her testimony. On this point see, also, State v. Jorgensen, 8 Or. App. 1, 492 P.2d 312 (App.Ct. 1971).
Despite the willingness of some courts to permit a witness to testify to events after the witness' recollection has been refreshed by a prior hypnotic session, it is clear that the hypnotically-produced recollection is not without substantial question as to reliability. Cases have recognized that hypnosis sometimes induces a subject to engage in fanciful or exaggerated versions of what the subject may incorrectly feel to be the truth. 41 *359 A.L.R.3d 1369, 1373 (1972). It is also recognized that a person under hypnosis is subject to heightened suggestibility. Greenfield v. Commonwealth, 214 Va. 710, 204 S.E.2d 414, 92 A.L.R.3d 432 (Sup.Ct.App. 1974).
In those cases where hypnosis has been used either by the defense or the prosecution, the courts have allowed general evidence regarding the uses, techniques, effects and reliability of hypnosis. Annotation, 92 A.L.R.3d 432, § 4. Thus, in People v. Modesto, 59 Cal.2d 722, 31 Cal. Rptr. 225, 382 P.2d 33 (Sup.Ct. 1963), where a psychiatrist had been allowed to testify that in her opinion the defendant did not have the requisite intent to commit the crime in question, the court held that the trial judge's exclusion of the psychiatrist's explanation of the hypnotic techniques she had used in examining defendant was error. It was held that this information should have been admitted as part of the foundation for the expert's opinion. Similarly, in Harding v. State, supra, the court held that a psychologist's testimony regarding the general hypnotic techniques used, the reliability of information brought out through hypnosis and the extent of suggestibility inherent in a hypnotic process was admissible. Other cases allowing general testimony on the use, effects, etc., of hypnosis include People v. Marsh, 170 Cal. App.2d 284, 338 P.2d 495 (D.Ct.App. 1959), and State v. Donovan, 128 Iowa 44, 102 N.W. 791 (Sup.Ct. 1905). However, in the case of United States v. Awkard, supra, the Court of Appeals for the Ninth Circuit held that since the admissibility of hypnotic evidence had not been in issue in that Circuit for a number of years, there was no need for a foundation concerning the nature and effect of hypnosis. While recognizing that in other jurisdictions where the admissibility of such evidence is still questionable, a foundation regarding the reliability of hypnosis is necessary, the court held such general hypnotic evidence inadmissible in the Ninth Circuit. The Awkard case also noted that a hypnotist should not be permitted to testify to the effect that in *360 his or her opinion the witness' memory was accurately refreshed by hypnosis. The Federal Rules of Evidence, R. 608(a), limit opinion evidence regarding a witness' credibility to "character for truthfulness or untruthfulness." Clearly, a witness' ability to recall an incident has nothing to do with his character; thus, even if the adversary raises the use of hypnosis as a basis of challenging the witness' testimony, the hypnotist should not be permitted to give his opinion that the witness' memory was accurately refreshed.
As was noted initially, the objective of the defense's motion is to preclude the victim, Jane Sell, from making an in-court identification of defendant Paul Hurd, because she was unwilling or unable to identify her attacker until after she submitted to a hypnotic exercise. Therefore, our attention has been focused upon the phenomenon of hypnosis and its uses and limitations. Normally, a defense motion to preclude or suppress a proposed in-court identification involves only an application of the landmark cases of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), from which evolve the mandate that evidence of a pretrial identification be excluded if the procedures employed were unnecessarily suggestive unless considering the totality of the circumstances the proffered identification was reliable.
An additional consideration is required in this case since the proposed in-court identification has been generated by the use of a technique or procedure which it is claimed has obtained general acceptance within the appropriate scientific community. Recognizing a common tendency to accept as reliable without serious challenge so-called scientific evidence, we must cautiously and somewhat skeptically view attempts to introduce evidence so classified as proof of guilt.
The leading case of Frye v. United States, 293 F. 1013 (D.C. Cir.1923), established the standard for judicial acceptance of so-called scientified evidence. The procedure proscribed is that if, after a canvas of scientific opinion, it can be shown that *361 the reliability of the device, procedure or technique has received general acceptance from the scientific community, the evidence generated by the use of the device, technique or procedure may be admitted in evidence at trial.
This case requires a consideration of the admissibility of recall allegedly induced by the application of hypnosis in light of both the due process considerations enunciated in Neil, supra, and its progeny, and the conditions imposed by Frye, supra, on the use of evidence produced by means of a scientific procedure.
We must immediately recognize that no claim is or can be made that hypnotically-induced recollections are scientifically accepted as reliable to the extent, for example that a breathalyzer is accepted as a device to measure the level of alcohol in the blood. It must be conceded that as a technique or procedure for determining "truth," hypnosis would fail to satisfy the Frye test of general acceptance in the scientific community.
Acknowledgment of the inability of hypnosis to demonstrably generate "truth" does not, however, require a determination that a witness who has submitted to a hypnotic exercise can never be allowed to testify to events which the witness could not recall prior to the hypnotic session.
In light of the expert testimony and medical journals admitted in evidence in this case, we are satisfied medical research has established that, to varying degrees, a large portion of the population has the capacity to enter a hypnotic trance and that hypnotized subjects who are directed to do so have the ability to concentrate on a past event and volunteer previously unrevealed statements concerning the event. In this limited sense hypnosis has met the test imposed by Frye.
Hynotically-induced testimony cannot be received or perceived in the same light as fingerprint evidence, ballistic tests or blood samples. Rather, the testimony generated by hypnosis must be offered as recollection refreshed by a process which has gained acceptance as a technique capable of inducing previously unrevealed statements. It is equally clear that persons *362 who become hypnotized, again in varying degrees, suffer a loss of critical judgment which renders them susceptible to suggestion and coercion. In addition to this loss of critical judgment, some persons in a hypnotic trance frequently feel a compulsion to supply information which they perceive to be sought and to provide some kind of response to questions being asked. The combination of the loss of critical judgment and sense of compulsion to provide responses frequently produces responses which are confabulations, mere fantasies and counter-factual statements.
Thus, even though hypnosis is a recognized phenomenon, the potential for the production of fantasy and confabulation during a hypnotic exercise militates against the automatic admissibility of hypnotically-induced recall until an acceptable level of reliability of that recall is established. In determining the issue of reliability it seems appropriate to use an analysis similar to that set forth by the Supreme Court in the cases of United States v. Wade, supra, and Neil v. Biggers, supra. As noted, these two landmark cases hold the Fifth Amendment to require procedural safeguards which must be met before evidence is admissible. The Biggers case, supra, establishes a two-prong test which requires that evidence of a pretrial identification be excluded if (1) there was unnecessary suggestiveness and (2) the totality of the circumstances of the information-seeking process did not then prove the reliability of the identification.
The Biggers court enumerated five factors for consideration in evaluating the admissibility of a pretrial identification, namely, (1) the opportunity of the witness or victim to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation and (5) the length of time between the crime and the confrontation.
Application of the two prongs of the Biggers test must be made on a case-by-case basis. In applying that test to a case *363 where hypnosis was employed we feel it is appropriate to adopt certain of the procedural safeguards derived from the testimony of Dr. Orne. In determining the admissibility of testimony allegedly generated by hypnosis, the court's initial function would be to determine whether there has been sufficient compliance with these safeguards to permit admissibility.
Those standards suggested by Dr. Orne and adopted by this court as a condition precedent for the admissibility of hypnotically-induced recollection are as follows:
(1) The hypnotic session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis.
(2) The qualified professional conducting the hypnotic session should be independent of and not responsible to the prosecutor, investigator or the defense.
(3) Any information given to the hypnotist by law enforcement personnel prior to the hypnotic session must be in written form so that subsequently the extent of the information the subject received from the hypnotist may be determined.
(4) Before induction of hypnosis, the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them, carefully avoiding adding any new elements to the witness' description of the events.
(5) All contacts between the hypnotist and the subject should be recorded so that a permanent record is available for comparison and study to establish that the witness has not received information or suggestion which might later be reported as having been first described by the subject during hypnosis. Videotape should be employed if possible, but should not be mandatory.
(6) Only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and post-hypnotic interview.
In determining the admissibility of the hypnotically-induced or assisted recall the procedures employed by the State in the *364 case under consideration should be compared to the standards prescribed. If the foregoing procedures have been satisfactorily met and the court is further satisfied that there was no impermissibly suggestive or coercive conduct by the hypnotist and law enforcement personnel connected with the hypnotic exercise, the witness who asserts that his or her recollection was assisted by the hypnotic exercise should be allowed to testify before the jury as to those recollections.
We must next address the issue of the burden of proof. There appears to be no clear law as to whether it is the State or the defense that has the burden of proof when an out-of-court identification is challenged. See, e.g., 31 N.J. Practice § 700 (Arnold). However, in 1979 the Maine Supreme Judicial Court held that when an out-of-court identification is challenged on 14th Amendment grounds, the defendant has the burden of proving by a preponderance of the evidence that the pretrial identification procedure was unnecessarily suggestive. If a defendant meets this burden, then the State must show by clear and convincing evidence that the identification was reliable under the totality of the circumstances. State v. Cefalo, 396 A.2d 233, 24 C.L. 2424 (Me. 1979).
While this method of allocating the burdens of proof is logically appealing, this court does not feel it is appropriate where the proffered testimony is the product of hypnosis. In light of the acknowledged potential for confabulation, it seems that the interests of justice require that the burden be placed upon the State to show by clear and convincing evidence that the hypnotically-induced recollections are sufficiently reliable to permit the introduction at trial. Thus, once the defendant raises an objection to the introduction of hypnotic evidence, the burden must shift to the State to prove its admissibility. The determination of the admissibility of the proffered testimony should be made in a hearing out of the presence of the jury. At a minimum, the State should be required to produce the witness, the hypnotist who conducted the hypnotic session, the written information given to the hypnotist and the recording of the *365 pre-hypnotic, hypnotic and post-hypnotic session. The burden is upon the State to establish by clear and convincing evidence that the standards imposed have been satisfied. The defense should be free to challenge the reliability of the proffered testimony by attacking the qualifications of the hypnotist, the methods employed, the conduct of the hypnotist and the law enforcement officials and should be permitted to offer expert opinion on the reliability of the allegedly hypnotically-assisted recollections, being offered in the case. The court should allow such other evidence as it finds relevant to the issues to be determined.
When we apply the foregoing standards to the procedures employed in this case, several deficiencies become apparent. The evidence shows the following:
(1) Dr. Spiegel is a well qualified and highly respected psychiatrist trained in the use of hypnosis. Therefore, there has been complete compliance with the first standard.
(2) There is no adequate record of what information concerning the incident was given by the law enforcement personnel to Dr. Spiegel; thus, the second safeguard was not complied with.
(3) It appears that Dr. Spiegel was an independent professional. Although he was evidently used by the prosecutor's office on prior occasions, there is no suggestion that he was motivated by any sense of obligation to the prosecutor.
(4) There was no effort (prior to hypnosis) to secure from Mrs. Sell a detailed statement of her recollection of the incident, thus making it impossible to compare those recollections with the statements she made during hypnosis.
(5) There was no tape recording of the pre-hypnotic session; thus, there is no way to assess whether it was unduly suggestive.
(6) There were several law enforcement officials present during the hypnotic and post-hypnotic session, giving rise to the legitimate criticism that they communicated to the witness the identification sought.
*366 Analysis of the facts of this case in terms of the five factors set forth in Biggers also reveals significant deficiencies. Initially, it must be conceded that the opportunity for Jane Sell to view her assailant is questionable in view of the sudden and shocking nature of the attack and the extent of lighting at the time. Secondly, the victim's degree of attention was certainly reduced under the circumstances. It would be reasonable to assume that Mrs. Sell concentrated her attention on escaping the attack rather than on observing her attacker. The third factor, i.e., the accuracy of the victim's prior description of the criminal, is not really relevant here because Mrs. Sell certainly knew her former husband. If she was able to and did in fact see him, she would be able to identify him; thus, any description would be irrelevant. The level of certainty demonstrated by Jane Sell regarding her identification is virtually nil as she expressed substantial doubt and confusion concerning the identity, thus negating the fourth factor set forth in Biggers. The fifth factor, involving the length of time between the crime and the confrontation, would tend to enhance reliability; however, in light of the aforementioned weaknesses the relatively short span of time between the crime and the hypnotic session does little for the State's case.
In light of the foregoing, it is clear that there was not substantial compliance with the safeguards adopted by this court. Furthermore, an examination of the transcripts of the hypnotic and post-hypnotic session compels the conclusion that Dr. Spiegel and Detective Pierangeli, while well-intentioned, impermissibly suggested to Mrs. Sell the identification of defendant Paul Hurd. It is a reasonable conclusion that Mrs. Sell entered the hypnotic session having excluded her husband, David Sell, as a suspect. As she herself expressed, she could not conceive that the police would have allowed her to live with her husband following the attack if the police realistically considered him suspect. It is apparent that Paul Hurd was the primary suspect in the opinion of the police. During the hypnotic *367 session Mrs. Sell was told she would be able to identify her attacker, a belief she apparently accepted. Following the making of that statement she was, by the form of questions, given two suspects, one of which she had already eliminated, leaving only defendant.
It is manifest from her comments in the post-hypnotic session that Mrs. Sell had doubts as to her identification. At this point Dr. Spiegel and Detective Pierangeli, convinced that Mrs. Sell had in fact seen her attacker, sought to compel her to identify defendant. The impact upon Mrs. Sell of the various comments to her of the possible dire consequences if she failed to identify Paul Hurd cannot be minimized. It seems apparent that Mrs. Sell remained confused during the post-hypnotic session. Her erroneous belief that defendant had remarried is adequate proof of her confusion. The comments made to her concerning the necessity to identify defendant at that time while she remained unsure of her identification raise serious questions that her identification of defendant was the product of a refreshed recollection. It had to become obvious to Mrs. Sell that Dr. Spiegel, whom we must assume she respected, and Detective Pierangeli, whom we know she admired, were convinced that Paul Hurd was the attacker. Mrs. Sell eventually accepted their conviction and convinced herself of the identification.
The cumulative effect of the questions and comments of the interrogators was at the least to make sure in Mrs. Sell's mind that which she was previously unable to perceive.
The eventual diagnosis of Mrs. Sell's condition by Dr. Spiegel as a traumatic neurosis requires additional comment.
Initially Dr. Spiegel characterized his efforts with Mrs. Sell as an interrogation process. Thereafter the defense, through the testimony of Dr. Orne, challenged the neutrality of that interrogation, particularly in the post-hypnotic session. It was then that Dr. Spiegel's contact with Mrs. Sell was characterized as therapeutic, designed to cure a traumatic neurosis, as opposed to investigative.
*368 Dr. Spiegel's definition of traumatic neurosis is not at issue and Mrs. Sell's reactions to this obviously horrendous incident in large measure satisfy the symptomatology of that condition.
The troublesome aspect of Dr. Spiegel's eventual diagnosis is the apparent inconsistency of his explanation of Mrs. Sell's condition. Dr. Spiegel first concluded that following the hypnotic session Mrs. Sell was cured of her neurosis and was restored to her normal sense of self and that she had regained normal control and was able to recall the details of the attack with her customary critical judgment. This analysis was made in response to criticism that the conduct of Dr. Spiegel and Detective Pierangeli during the post-hypnotic session was suggestive and coercive. Contrary to the assertion that Mrs. Sell had regained normal control, the transcript of the post-hypnotic session reflects continued confusion, doubt, uncertainty and inaccuracy on the part of Mrs. Sell. When questioned about his seeming inconsistency between the assertion of return to normalcy and Mrs. Sell's obvious confusion in the post-hypnotic session, the explanation offered by Dr. Spiegel was that with a patient suffering a traumatic neurosis the return to normal control and critical judgment does not occur immediately, and that is is an evolving process which occurs over a period of days or weeks. If this is in fact the course of rehabilitation and return to normal critical judgment for one who has suffered and recovered from a traumatic neurosis, then it is fair to conclude, and the transcript so reflects, that immediately following the hypnosis Mrs. Sell was still confused, unsure and doubtful concerning her recollection. Yet it was during this period, as previously noted, that comments made to Mrs. Sell had a decided bias towards identification of Paul Hurd and contained elements of suggestion and coercion.
Thus, on the one hand, Dr. Spiegel seems to have defended his conduct of the post-hypnotic session as an acceptable process in the treatment of traumatic neurosis and insisted that any apparently suggestive comments or inducements would not have affected Mrs. Sell since she had regained her normal control and *369 critical judgment. However, when questioned about the obvious confusion and hesitancy of Mrs. Sell during that post-hypnotic session which was a condition clearly contrary to a return to normal control and critical judgment, he offered the explanation that return to normal critical judgment does not take place immediately and may require several days, leaving open the probability that to a substantial degree Mrs. Sell remained confused, hesitant and susceptible to suggestion during the post-hypnotic session, during which considerable pressure was applied to induce her to identify the defendant.
This inconsistency precludes acceptance of the assertions by Dr. Spiegel that the suggestive comments made to Mrs. Sell during the post-hypnotic session can be overlooked or disregarded on the theory that having recovered from a traumatic neurosis, she had regained sufficient critical judgment to have resisted suggestions which she knew to be contrary to the facts. By virtue of this inconsistency we must continue to hold that the comments made to Mrs. Sell were capable of inducing misidentification.
Under all these circumstances we cannot find that the State has met its burden to establish by clear and convincing evidence that there was no impermissibly suggestive or coercive conduct during the hypnotic session.
In reviewing all the evidence in this case, it cannot be said that under the totality of the circumstances the identification of the defendant was reliable.
By reason of these conclusions, the application of defendant to preclude the in-court identification of defendant by the victim is granted.