STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
ALONZO WALKER, DEFENDANT-APPELLANT.

Argued March 19, 1962—Decided May 7, 1962.

*Mr. Benjamin Asbell* argued the cause for the defendant-appellant (*Mr. Harry D. Ambrose, Jr.,* on the brief).

*Mr. N. Douglas Russell,* Assistant Cumberland County Prosecutor, argued the cause for the plaintiff-respondent (*Mr. Joseph H. Tuso,* Cumberland County Prosecutor, attorney).

The opinion of the court was delivered by

PROCTOR, J. The defendant Alonzo Walker was convicted of murder in the first degree and sentenced to life imprisonment. He appeals under *R. R.* 1:2–1(c).

The defendant was indicted for the murder of Mary Johnson on September 9, 1956. He entered a plea of *non vult* and was sentenced to 25 to 30 years in prison. After serving several months of this sentence, he applied for a writ of *habeas corpus* on the ground that he did not under-

stand the nature of his plea. The County Court denied his application, but on appeal the Appellate Division reversed and a trial was held at which the defendant pleaded not guilty. He was convicted of murder in the first degree with a recommendation of life imprisonment. On his appeal we reversed the conviction and remanded for a new trial because of error in the court's charge to the jury. *State v. Walker*, 33 *N. J.* 580 (1960). The trial giving rise to the present appeal resulted.

Mary Johnson was fatally shot in the early evening on Sunday, September 9, 1956, while sitting at the kitchen table in the house of her friend, Mary Brooks, at 30 Eagle Street, Bridgeton. The State called several witnesses and introduced two signed statements given by the defendant to the police to prove that he was the murderer. It was established that the defendant and Mary Johnson had lived together in Philadelphia prior to the shooting. According to the defendant's first statement made after he was apprehended on the night of the homicide the following occurred: On Friday night, two days before the shooting, he and Mary Johnson had a fight during which he slapped her; the following day she went to the Brooks house in Bridgeton. On Sunday, September 9, the defendant drove there with his son, Alonzo Walker, Jr., "to talk with her about coming back." In addition to Mary Johnson, he found Alonzo Williams, Mary Williams (Brooks) and Rosella Campbell there. During the course of the day he continually sought to persuade Mary Johnson to return with him to Philadelphia, but she refused. At one point he left the house and bought a skirt and blouse for her. When he returned with the clothes he also brought with him a loaded revolver which he had in his automobile. He said he took the gun with him to give it to Mary Johnson so she could "take it and get rid of it" because "when I get mad she is scared of it." However, he wanted her to promise to return with him to Philadelphia before he would give up the gun. He sat at the kitchen table across from

her and continued his efforts to persuade her, but she was adamant. While they were talking he took the gun out of his pocket and when she again refused him, he "reared back in the chair and said 'you gotta go' and the gun went off." After the shooting he ran out of the front door and dropped the gun in a neighboring yard. The defendant signed this statement. However, after it was noticed that he could not read, the statement was read aloud to him and, in the presence of Detectives Fletcher and Westcott, he again signed it. These officers testified the written statement was in complete accord with the story told by the defendant.

Mary Brooks testified Mary Johnson's throat "was swollen, and you could see the fingernails and dark appearance" when she came to the Brooks house on Saturday, September 8. She said the defendant came to her home the next day and continually begged Mary Johnson to return with him to Philadelphia. Mary Johnson refused. Mary Brooks further testified that immediately prior to the shooting Mary Johnson was seated at the table in the kitchen; that the defendant was standing on the opposite side of the table and that she was standing alongside him. He was insisting that Mary Johnson return with him to Philadelphia that night, but she again refused. Then, in Mary Brooks' words: "I said, 'Let her stay' * * * he said, 'No, she is going back to Philly with me.' I said, 'Let her stay.' He said, 'If she don't go back to Philly with me, she is not going back with anybody else' * * * 'She is going back with me, because nobody else is going to have her,' and that is when the report [gun shot] went off." After the shooting she pushed the defendant, he pushed her in return and ran out of the house. She testified she never saw the gun.

On cross-examination the defendant sought to impeach Mary Brooks' testimony by the use of a signed statement she gave to a private investigator, Anthony Fiorella, on December 3, 1958. Her description there of the conversa-

tion which she had with the defendant was not identical with her testimony quoted above in that the statement contained no reference to the defendant's ever having said "nobody else is going to have her."

Alonzo Williams corroborated Mary Brooks' description of Mary Johnson's physical condition when she came to the Brooks house. He too testified the defendant came there on Sunday, September 9, and sought to persuade Mary Johnson to return with him to Philadelphia. Since Williams was in the living room playing records at the time of the shooting, he did not witness the homicide or hear the shot. However, he saw the defendant "run by me like a flash" out the front door and up the street. He then learned Mary Johnson had been shot.

The defendant was apprehended by two Bridgeton policemen, Officers Ayars and Howard, on the night of the shooting. These officers testified the defendant, while being driven to police headquarters, admitted shooting Mary Johnson and then throwing the gun away. Officer Ayars testified the defendant told him "that he came down here to get her to go back to live with him, to bring her back home. And he had been with her a few times that day, and each time he came back to the house he got madder, and finally when the time came for her to go, she wouldn't go, and he shot her and he threw the gun somewhere in the yard."

Police officers testified that shortly after the defendant was brought to headquarters he accompanied them in a search for the gun. Although the search that night was unsuccessful, the missing gun was found by a police officer the next day in a backyard near the scene of the crime. After he was confronted with the gun, the defendant signed a second statement in which he admitted "That is the gun I had in my hand when I shot Mary Johnson." Chief Semple and Officer Kuyper testified the written statement accurately represented defendant's admission. Medical and ballistics experts testified Mary Johnson's death was caused by a bullet fired from this gun.

The defendant took the stand and denied shooting Mary Johnson and ever having seen the gun before. He testified that: Mary Johnson had a fight with her landlord on Friday, September 7; on Sunday, September 9, he found a note from Mary Johnson saying "I am going down to Bridgeton. If you want me come down there"; and therefore he drove to Bridgeton with his son. When he arrived at the Brooks home he found everybody drunk. He said Mary Johnson looked "terrible" and needed some clothes, so he left the Brooks house, bought her some clothes and returned. According to the defendant, Mary Johnson was undecided as to whether she wanted to go back to Philadelphia that night. The defendant, Mary Johnson and Mary Brooks were sitting at the kitchen table talking when they heard a gunshot. He noticed that Mary Johnson was shot on the side of her head. He said he wanted to take Mary Johnson to the hospital but Mary Brooks said he could not do anything before the police arrived. He waited around for about one hour and nobody came. The defendant said he then felt "skiddish," thought perhaps the bullet was intended for him and just started walking. He said the signed statements given the Bridgeton police did not represent what he had told them; that his story then was the same at it is now. Since he could not read he believed the police had written what he said and not the version which actually appears. On cross-examination the State confronted defendant with a statement filed with his application in the *habeas corpus* proceedings. In that statement the defendant said: He brought the gun from his automobile into the house and told Mary Johnson he would give it to her if she would return with him to Philadelphia; while they sat at the kitchen table Mary Johnson reached across the table to take the gun away from him; he resisted and the gun accidently discharged shooting Mary Johnson; the police were called, and while awaiting their arrival, he took a walk and threw the gun away. The defendant attempted to explain away these inconsistencies with his

present testimony in the same way as the other signed statements, *i. e.,* his inability to read and know what he was signing. The State also confronted the defendant with his oral testimony during the *habeas corpus* proceedings where he referred to a gun which he said he had and Mary Johnson wanted. The defendant could not explain the contradiction between this and his present testimony, and finally asserted that he had not testified accurately during the *habeas corpus* proceedings.

The defendant's only other witness was Anthony Fiorella who testified that he was the investigator who had taken Mary Brooks' statement mentioned above.

During the second day of the trial, the defendant's counsel made a motion that the defendant be taken that evening "to the City of Millville and examined by the use of a polygraph or lie detector" and offered "to join with the State in a stipulation that the results of the same may be used in evidence." The State refused to consent to the admission of the results of the polygraph test in evidence, but suggested it would consent if the defendant agreed to enter a plea in the event the test indicated he shot Mary Johnson. The defendant refused to be so bound. The court, although it said the defendant could take a polygraph test if he wished, ruled that it would not admit the test results into evidence without the State's consent.

On this appeal the defendant contends the court erred in refusing to allow the results of the proposed polygraph test in evidence. The defendant recognizes that the results of lie-detector tests have been held inadmissible generally throughout the country, but urges "that this Court should now take the lead in establishing a trend which must eventually culminate in the admission of the results of polygraph tests when properly conducted and supervised into evidence in all courts." The State contends the results of a polygraph examination are inadmissible and, in any event, the defendant's request came too late.

When scientific aids to the discovery of truth achieve a high degree of recognition as to their reliability, we do not hesitate to take judicial notice of this fact and admit evidence obtained through their use when they are administered by qualified persons. *State v. Dantonio,* 18 *N. J.* 570 (1955) (radar); *State v. Cerciello,* 86 *N. J. L.* 309 (*E. & A.* 1914) (finger prints); see *Cortese v. Cortese,* 10 *N. J. Super.* 152 (*App. Div.* 1950) (blood grouping). The polygraph, commonly known as a lie-detector, is a machine which records certain physiological responses in an examinee as he replies to questions put to him by an examiner. Proponents of the test say the polygraph accurately records these bodily changes thus enabling a skilled examiner to make an analysis of the truth or falsehood of the answers on a scientific basis. *McCormick, Evidence* § 174 (1954); *Richardson, Modern Scientific Evidence* § 10.6 (1961). On the other hand, it has been said that the scientific basis of the polygraph is questionable for two reasons: (1) there appears to be little evidence supporting the conclusion that lying causes a reaction which can be accurately measured; and (2) the techniques of the process enhance the possibility of error from interpretation. Skolnick, "Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection," 70 *Yale L. J.* 694 (1961).

Although this court has not had occasion to pass upon the reliability or admissibility of the results of polygraph tests, *State v. Emery,* 27 *N. J.* 348, 357 (1958), our Appellate Division in *State v. Arnwine,* 67 *N. J. Super.* 483, 498 (1961), in *dictum* said that the results of such tests are inadmissible in a criminal case. This *dictum* is in accord with the holdings of almost all the courts of this country which have passed upon the question. *Id.,* at *pp.* 494–95. The reason most commonly assigned for the exclusion of such evidence is that the lie detector has not as yet attained scientific acceptance as a reliable means of ascertaining the truth. Annot. 23 *A. L. R. 2d* 1306 (1952)

(citing cases); 3 *Wigmore, Evidence* § 999 n. 2 (*3d ed.* 1940, *Supp.* 1959).

In the present case the defendant failed to offer any evidence indicating that there is at this time a general scientific acceptance of the reliability of a polygraph. The New York Court of Appeals in *People v. Forte,* 279 *N. Y.* 204, 18 *N. E. 2d* 31, 119 *A. L. R.* 1198 (1938), reargument denied, 279 *N. Y.* 788, 18 *N. E. 2d* 870 (1939), was confronted with a similar situation. There the defendant was tried and convicted of first degree murder. During the trial he moved that he be given a pathometer or lie-detector test. The trial court denied the motion. On appeal, the court, upholding the denial of the motion and affirming the conviction, said:

"We cannot take judicial notice that this instrument is or is not effective for the purpose of determining the truth. Can it be depended upon to operate with complete success on persons of varying emotional stability? The record is devoid of evidence tending to show a general scientific recognition that the pathometer possesses efficacy. Evidence relating to handwriting, finger printing and ballistics is recognized by experts as possessing such value that reasonable certainty can follow from tests. Until such a fact, if it be a fact, is demonstrated by qualified experts in respect to the 'lie detector,' we cannot hold as matter of law that error was committed in refusing to allow defendant to experiment with it." (18 *N. E. 2d*, at *p.* 32.)

We believe the above holding represents the current law of New York. See *United States ex rel. Sadawy v. Fay,* 284 *F. 2d* 426 (2 *Cir.* 1960); *People v. Dobler,* 29 *Misc. 2d* 481, 482, 215 *N. Y. S. 2d* 313, 314 (*Suffolk Cty. Ct.* 1961). Like the New York Court of Appeals, we do not have sufficient knowledge to say the polygraph has or has not attained that degree of accuracy to warrant our taking judicial notice that it is or is not a reliable aid in learning the truth.

Professor McCormick, perhaps the leading advocate for some judicial recognition of the results obtained through the use of polygraph tests, takes the position these results

should not be excluded in all circumstances, but rather admissibility should be a matter of judicial discretion. *McCormick, supra.* But even he agrees that the test, based as it is upon physiological measurements of emotional responses to questions propounded by an examiner, should be conducted before the trial commences under the most relaxed conditions possible. *Ibid.* In the present case the defendant made his request in the midst of a heated trial. This highly emotional point is hardly an appropriate time to obtain reliable physiological responses giving rise to dependable results, if such are at all obtainable.

We do not now express any opinion as to whether the results of a lie-detector test should, under all circumstances, be excluded in criminal cases. It is enough for us to say that in the circumstances of the present case the trial court did not err in its ruling.

The defendant next argues that the trial court erred in denying his motion for acquittal upon the charge of first degree murder. He concedes the State made out a *prima facie* case of second-degree murder but contends the evidence as to premeditation, an element of first-degree murder, was insufficient to warrant the submission of that issue to the jury. From his argument, we assume the defendant also intends to challenge the sufficiency of the evidence as to the independent element of deliberation. He says there is no evidence that he harbored a criminal intent by bringing the gun to Bridgeton; on the contrary, if the evidence proves anything regarding the gun, it shows he brought it in good faith to induce Mary Johnson to return. He further contends that the only possible basis upon which these elements might be grounded is the testimony of Mary Brooks that immediately before the shooting he said if he could not have Mary Johnson no one else would, and that this is insufficient to show "a period of time between the statement attributed to the defendant and a firing of the shot during which the premeditation could have taken place in the mind of the defendant."

218

These contentions are clearly without merit. No particular period of time need elapse between the formation of the purpose to kill and its execution. *Donnelly v. State,* 26 *N. J. L.* 601, 616–617 (*E. & A.* 1857). Therefore, even if Mary Brooks' testimony was the only proof of premeditation and deliberation, the fact that defendant's statement was made a very short period of time before he pulled the trigger would not be enough to warrant dismissal of the first degree murder charge, as the jury could justifiably find those elements essential to sustain its verdict, *i. e.,* the defendant fully conceived the design to kill and deliberated upon it before he willfully committed the fatal act. Moreover, the State did not rely solely upon this aspect of the testimony of Mary Brooks to prove first degree murder. There was additional testimony of Mary Brooks along with the testimony of the apprehending police officers and Alonzo Williams; also in evidence were defendant's two signed statements. From all of these the jury could conclude that: The defendant came to Bridgeton determined to bring Mary Johnson back with him to Philadelphia; he brought a gun which he left in his automobile; when she refused his overtures, he concluded it might be necessary to use the gun and therefore brought it into the house; the efforts of Mary Brooks could not dissuade him from accomplishing his objective, *i. e.,* either Mary Johnson would return with him to Philadelphia or he would kill her; and when she refused to return with him, he shot her. If the jury reached this conclusion, as it readily could, its finding of a premeditated, deliberate and willful killing was fully warranted. We conclude the court did not err in denying the motion for a dismissal of the first degree murder charge.

The defendant next contends the verdict of the jury was against the weight of the evidence. He first argues the State's case of premeditated killing was based upon the testimony of Mary Brooks and that her testimony was "completely impeached and nullified" because of the variance between her testimony at the trial and her signed

statement made in 1958 to Fiorella. She testified that before the shot was fired the defendant made a statement to the effect that if he could not have Mary Johnson no one else would. Her written statement did not mention such an expression by the defendant. In the main her testimony was in accord with her statement and we cannot say from the variance pointed to here that the testimony of Mary Brooks was "nullified." The extent to which her testimony should be believed was a question for the jury to consider and the trial court properly instructed the jury in that regard. See *State v. Landeros,* 20 *N. J.* 76 (1955). The defendant next contends that any value which his prior statements might have had in proving the State's case was voided by his repudiation on the witness stand, thus leaving no evidence to prove that he killed Mary Johnson. His testimony is replete with numerous contradictions and the jury was charged with deciding which of his stories, if any, represented the truth. Our review is "aimed only at correcting injustice resulting from obvious failure by the jury to perform its function," *State v. Haines,* 18 *N. J.* 550, at 565 (1955), and a verdict will not be set aside as against the weight of the evidence unless it is clearly the result of mistake, passion, prejudice or partiality. *State v. Forcella,* 35 *N. J.* 168, at *p.* 175 (1961). We see no reason to disturb the jury's verdict as the evidence was more than enough to sustain it.

Finally, from our examination of the record we see no merit in defendant's additional contentions that he was prejudiced by the action of the trial judge in interrogating him and interrupting his counsel's summation to the jury.

The judgment of conviction is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.