STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. PAUL HURD, DEFENDANT-RESPONDENT.

Argued February 24, 1981—Decided July 14, 1981.

528

*Robert D. Clarke,* Assistant Prosecutor, argued the cause for appellant (*David Linett,* Somerset County Prosecutor, attorney).

*Richard S. Rebeck,* Middlesex County Prosecutor, argued the cause for *amicus curiae* County Prosecutors' Association of New Jersey (*Roger W. Breslin, Jr.,* Bergen County Prosecutor, attorney; *William F. Lamb,* Assistant Prosecutor, of counsel and on the brief).

*Leo Kaplowitz* argued the cause for respondents (*Kaplowitz & Wise,* attorneys).

*Cary B. Cheifetz* submitted a brief on behalf of *amicus curiae* International Association for Forensic Hypnosis (*Emolo & Cheifetz,* attorneys; *Henry B. Rothblatt,* a member of the New York bar, of counsel).

The opinion of the Court was delivered by

PASHMAN, J.

This case presents the question, previously undecided in this State, whether the testimony of a witness who has undergone hypnosis to refresh her recollection is admissible in a criminal trial and, if so, in what circumstances. Although we recognize the problems raised by this use of hypnosis, we hold that, subject to strict safeguards to ensure the reliability of the hypnotic procedure, such testimony is admissible. In this case, we find that the State has failed to demonstrate the reliability of the hypnotic procedures it used. Therefore, we affirm the order of the trial court suppressing the challenged testimony.

I

At approximately 5:45 a. m. on June 22, 1978, Jane Sell was attacked and stabbed repeatedly while sleeping in the bedroom of her ground floor apartment. Her assailant apparently did not intend to rob her or commit a sexual assault. She ultimate-

ly escaped her attacker, but only after sustaining many knife wounds.

Mrs. Sell lived in the apartment with her husband, David Sell, and her three sons, two of whom are children from a previous marriage with the defendant, Paul Hurd. Although at the time of the assault she had been divorced from the defendant for seven years, they continued to disagree over the disposition of jointly owned property and visitation rights. The most recent discussion had been a telephone conversation between David Sell and the defendant on the evening before the assault.

On that evening, David Sell had fallen asleep in the living room. He testified that he was awakened by his wife's screams and rushed to her aid. He met her in the hallway outside their bedroom. She told him that she had been stabbed by someone through the window which was at ground level. Without looking to see if the assailant was still there, he telephoned the police for help.

Immediately after the attack, Mrs. Sell was either unable or unwilling to describe her assailant. In the hospital emergency room a few hours after she arrived, she asked the police to "check out" her former husband, the defendant, and to watch her children, but she did not identify the defendant as the attacker.

The investigation by the police department and prosecutor's office centered on two suspects, David Sell and the defendant. Because Mrs. Sell stated that she was still unable to identify her attacker after she left the hospital on July 3, the prosecutor's office suggested that she visit a psychiatrist who might be able to enhance her recollection of the incident through hypnosis. Mrs. Sell agreed. On July 14, 1978, two officers from the prosecutor's office, Detective Marilyn Pierangeli and Lt. Laurence VanWinkle, drove Mrs. Sell and her husband to the New York City office of Dr. Herbert Spiegel. Besides Dr. Spiegel and Mrs. Sell, the only people present during the hypnotic session were the two officers and a medical student; David Sell waited outside the room.

Dr. Spiegel first conducted some tests to determine whether Mrs. Sell was capable of undergoing hypnosis. Once the doctor was satisfied that Mrs. Sell was hypnotizable, a tape recorder was turned on and the interview began. Before subjecting her to hypnosis, Dr. Spiegel questioned Mrs. Sell concerning her memory of the event and learned that she had images of a person standing near the dresser in her bedroom and a person leaning in the window. She also knew the name of one of the suspects in the case, but did not reveal which one. Finally, Dr. Spiegel instructed Mrs. Sell that while she was in a trance she should respond to questions from the officers as well as to his questions.

After this brief interview, the doctor induced hypnosis. Mrs. Sell began to relive the attack. In response to Dr. Spiegel's questions she described various facial features of her assailant and his clothing. Suddenly she began to cry hysterically. At this point Detective Pierangeli continued the questioning: "Jane, I want you to think very, very hard of what you are seeing right now. It's up to you to help me. It is up to you now to describe for me what you see. Is it somebody that you know, Jane?" Mrs. Sell answered, "Yes." "Is it David, Jane?" "No," Mrs. Sell cried. "Is it Paul?" "Yes," Mrs. Sell responded emotionally.

After Mrs. Sell was brought out of the trance and into a post-hypnotic state, she expressed mistrust "about her thinking." Dr. Spiegel and Detective Pierangeli in effect encouraged her to accept the identification she had made. They explained to her that unless she made an identification, the defendant would remain free to attack her again, possibly leaving her children without a mother. They also tried to convince her to make an identification, noting that she was indirectly implicating David Sell, who remained a suspect, by not identifying her assailant. Even after they left Dr. Spiegel's office, Detective Pierangeli continued the encouragement during dinner.

Six days later, on July 20, 1978, Jane Sell came to the North Plainfield Police Department and gave a statement identifying Paul Hurd as her attacker. On the basis of this statement, defendant was indicted and charged with assault with intent to kill, atrocious assault and battery, assault with a deadly weapon, possession of a dangerous knife, and breaking and entry with intent to assault. Before the jury selection, defendant moved to suppress the proposed in-court identification by Mrs. Sell. He argued that testimony refreshed through the use of hypnosis is *per se* inadmissible because hypnosis fails to satisfy the standard for the admissibility of scientific evidence, *see Frye v. United States,* 293 *F.* 1013 (D.C.Cir. 1923), according to which evidence derived through a scientific procedure may be introduced if it is generally accepted that such procedures yield reasonably reliable results. Even if such testimony is not *per se* inadmissible, he argued in the alternative, the hypnotic procedure in this case was so tainted by coercion and suggestion as to render the resulting identification inadmissible because it was likely to result in irreparable misidentification. *See Neil v. Biggers,* 409 *U.S.* 188, 93 *S.Ct.* 375, 34 *L.Ed.*2d 401 (1972).

After hearing lengthy expert testimony concerning the reliability of hypnosis *as a means of refreshing recollection* and the likely effect of hypnosis on Mrs. Sell,[1] the trial court suppressed the proposed identification. 173 *N.J.Super.* 333 (Law Div. 1980). In a thoughtful opinion, it applied the *Frye* test for scientific evidence and declined to hold that hypnotically refreshed testimony is *per se* inadmissible. Nevertheless, it found that "the potential for the production of fantasy and confabulation during a hypnotic exercise militates against the automatic admissibility of hypnotically-induced recall until an acceptable level of reliability of that recall is established." *Id.* at 362. The court established a two-part test for admissibility. First, it adopted

---

[1]The expert testimony is thoroughly summarized in the trial court's opinion. 173 *N.J.Super.* 333, 340–56 (Law Div.1980).

procedural safeguards suggested by Dr. Martin Orne, an expert witness for the defense:

> (1) The hypnotic session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis.
>
> (2) The qualified professional conducting the hypnotic session should be independent of and not responsible to the prosecutor, investigator or the defense.
>
> (3) Any information given to the hypnotist by law enforcement personnel prior to the hypnotic session must be in written form so that subsequently the extent of the information the subject received from the hypnotist may be determined.
>
> (4) Before induction of hypnosis, the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them, carefully avoiding adding any new elements to the witness' description of the events.
>
> (5) All contacts between the hypnotist and the subject should be recorded so that a permanent record is available for comparison and study to establish that the witness has not received information or suggestion which might later be reported as having been first described by the subject during hypnosis. Videotape should be employed if possible, but should not be mandatory.
>
> (6) Only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and post-hypnotic interview.
>
> [*Id.* at 363]

The court imposed on the State the burden of establishing by clear and convincing evidence that it had complied with these standards. *Id.* at 365. If these procedures had been followed, the court held that the State would then have the additional burden of showing that "there was no impermissibly suggestive or coercive conduct by the hypnotist and law enforcement personnel connected with the hypnotic exercise," *id.* at 364, again by clear and convincing evidence, *id.* at 369. Applying these standards to the present case, the court found that the State had failed to satisfy the procedural safeguards and that Dr. Spiegel and law enforcement personnel had exerted pressure on Mrs. Sell to induce her to identify the defendant, both during and after the hypnotic session. Consequently, the court granted defendant's motion to suppress the identification.

The State filed a motion in the Appellate Division for leave to appeal the trial court's order. This motion was denied. The prosecutor then filed a motion in this Court seeking leave to appeal the lower courts' orders. We granted this motion in

order to address the novel questions raised in this case. 85 *N.J.* 133 (1980), and we now affirm the order of the trial court.

## II

Hypnosis is a state of heightened concentration with diminished awareness of peripheral events. One of its consequences is that the suggestibility of the subject increases while he or she is hypnotized. D. Cheek & L. LeCron, *Clinical Hypnotherapy* 13 (1968). Although there are numerous techniques for inducing hypnosis, they share common features. *See* 9 *Encyclopedia Britannica, Hypnosis* 133, 135 (1974). The hypnotist first establishes a rapport with the subject and then creates a passiveness that will make the subject receptive to suggestions, typically by engendering eye fatigue through focusing on a close object. Finally, the hypnotist induces a trance through a series of suggestions requiring increased distortion of perception until it is clear that the subject is hypnotized.

Since World War II, hypnosis has been recognized as a proper subject for laboratory and clinical research. It is now an accepted medical tool for psychotherapy, the treatment of psychosomatic illnesses, anesthesia, and memory recall. *See* Council on Medical Health of the American Medical Association, *Medical Uses of Hypnosis,* 168 *J.A.M.A.* 186 (1958), *cited in* Dilloff, *The Admissibility of Hypnotically Induced Testimony,* 4 *Ohio N.U.L. Rev.* 1, 3 n.9 (1977). *See generally* 9 *Encyclopedia Britannica, supra,* at 136–37.

The hypnotic procedure most frequently used to facilitate memory recall is age regression. At the request of the hypnotist, the subject is apparently able to relive a past experience. This phenomenon has received extensive clinical and laboratory study, providing information concerning the nature of the process and the historical accuracy of the recall elicited by hypnosis.

The principal question in this case is whether the testimony of a witness who has undergone hypnosis to refresh her memory is admissible in a criminal trial and, if so, under what conditions.

Courts in other jurisdictions have divided in their treatment of this issue.

A majority of the courts that have considered the question have held that hypnotically induced testimony is admissible. *United States v. Awkward*, 597 *F.*2d 667 (9th Cir.), *cert.* denied, 444 *U.S.* 885, 100 *S.Ct.* 179, 62 *L.Ed.*2d 116 (1979); *United States v. Narciso*, 446 *F.Supp.* 252 (E.D.Mich. 1977); *Clark v. State*, 379 *So.*2d 372 (Fla.D.Ct.App. 1980); *Creamer v. State*, 232 *Ga.* 136, 205 *S.E.*2d 240 (1974); *People v. Smrekar*, 68 *Ill.App.*3d 379, 385 *N.E.*2d 848, 24 *Ill.Dec.* 707 (1979); *State v. McQueen*, 295 *N.C.* 96, 244 *S.E.*2d 414 (1978); *People v. Hughes*, 99 *Misc.*2d 863, 417 *N.Y.S.*2d 643 (Cty.Ct. 1979); *State v. Jorgensen*, 8 *Or.App.* 1, 492 *P.*2d 312 (1971). These cases have generally reasoned that testimony of a witness whose memory has been revived through hypnosis should be treated like any other present recollection refreshed. That the witness' memory may have been impaired by hypnosis or that suggestive material may have been used to refresh his recollection is considered to be a matter affecting credibility, not admissibility. It is assumed that skillful cross-examination will enable the jury to evaluate the effect of hypnosis on the witness and the credibility of his testimony. *See, e. g., State v. McQueen, supra*, 295 *N.C.* at 120–21, 244 *S.E.* 2d at 427–28; *State v. Jorgensen, supra*, 8 *Or.App.* at 9, 492 *P.*2d at 315.

Two recent cases have criticized the assumptions underlying this attitude toward hypnotically refreshed testimony. *State v. Mena*, 128 *Ariz.* 226, 624 *P.*2d 1274 (1981); *State v. Mack, Minn.*, 292 *N.W.*2d 764 (1980). Unlike most of the earlier cases, the courts in *Mena* and *Mack* took into account expert testimony and other evidence concerning the problems associated with using hypnosis as a means of reviving memory. Because hypnosis is a scientific procedure capable of irreparably contaminating a witness' memory, the Arizona and Minnesota courts held that the procedure must satisfy the standard for the admissibility of scientific evidence established in *Frye v. United States*, 293 *F.* 1013 (D.C.Cir. 1923). *Mena, supra*, 128 *Ariz.* at 231, 624 *P.*2d at

1279; *Mack, supra,* 292 *N.W.*2d at 768; *accord, Polk v. State,* 48 *Md.App.* 382, 427 *A.*2d 1041, 1048 (Ct.Spec.App. 1981); *People v. Tait,* 99 *Mich.App.* 19, 297 *N.W.*2d 853, 857 (1980). Applying the *Frye* test, both courts found that hypnosis has not "gained general acceptance in the particular field in which it belongs," *Frye, supra,* 293 *F.* at 1014, at least as a means of obtaining accurate recall of prior events. Therefore, they held that the testimony of a witness who has undergone hypnosis to refresh his recollection is *per se* inadmissible in a criminal trial. *Mena, supra; Mack, supra.*

We agree with the trial court below and those courts elsewhere that have held that hypnotically refreshed testimony must satisfy the standard of acceptability for scientific evidence before it is admissible in a criminal trial. According to our most recent formulation of this standard, the results of scientific tests are admissible only when they have "sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of the truth." *State v. Cary,* 49 *N.J.* 343, 352 (1967). This standard has previously been applied only to the results of physical tests such as radar, *State v. Dantonio,* 18 *N.J.* 570 (1955), the polygraph, *State v. Walker,* 37 *N.J.* 208, *cert.* denied, 371 *U.S.* 850, 83 *S.Ct.* 89, 9 *L.Ed.*2d 86 (1962), and voiceprints, *State v. Cary, supra.* But we believe that the policy reasons embodied in the general acceptance standard are germane to hypnotically refreshed testimony as well.

Like the results of a polygraph examination or voiceprint analysis, the credibility of recall stimulated by hypnosis depends upon the reliability of the scientific procedure used. If the procedure is not capable of yielding reasonably reliable results, then its probative value may be outweighed by the risks entailed in its use in a criminal trial. *See Evid.R.* 4. These risks include prejudice, jury confusion, and consumption of time and trial resources. *Cf. Commonwealth v. Vitello,* 376 *Mass.* 426, 381 *N.E.*2d 582, 592–94 (1978) (analyzing policy reasons for exclud-

ing polygraph results). When hypnosis results in an eyewitness identification of the defendant, for example, the defendant is clearly prejudiced if there is not even a reasonable likelihood that the witness' memory was accurately revived. Because the introduction of hypnotically refreshed testimony will often require additional expert testimony by both sides to help the jury evaluate the reliability of the procedures followed during hypnosis, there is a potential for confusion of the issues and a tremendous consumption of trial resources. The potential disadvantages would be even greater if it were necessary to prove the lack of general acceptance of the procedure in every case as well as the unreliability of its use in the particular instance. These disadvantages must be justified by the probative worth of the evidence, as demonstrated by satisfaction of the general acceptance standard, before hypnotically refreshed testimony will be admissible.

## III

▉▉▉ Based on the expert testimony and documentary evidence submitted at the pretrial hearing, the trial court below made the following finding concerning the general acceptance standard:

> [M]edical research has established that to varying degrees, a large portion of the population has the capacity to enter a hypnotic trance and that hypnotized subjects who are directed to do so have the ability to concentrate on a past event and volunteer previously unrevealed statements concerning the event. In this limited sense hypnosis has met the test imposed by *Frye*. [173 *N.J.Super.* at 361]

Unlike the courts in *Mena, supra,* and *Mack, supra,* the court below did not demand, as a precondition of admissibility, that hypnosis be generally accepted as a means of reviving truthful or historically accurate recall. We think this was correct. The purpose of using hypnosis is not to obtain truth, as a polygraph or "truth serum" is supposed to do. Instead, hypnosis is employed as a means of overcoming amnesia and restoring the memory of a witness. *See* Spector & Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?*, 38 *Ohio St.L.J.* 567, 584 (1977) [hereinafter cited as Spector &

Foster]. In light of this purpose, hypnosis can be considered reasonably reliable if it is able to yield recollections as accurate as those of an ordinary witness, which likewise are often historically inaccurate. Based on the evidence submitted at trial, we are satisfied that the use of hypnosis to refresh memory satisfies the *Frye* standard in certain instances. If it is conducted properly and used only in appropriate cases, hypnosis is generally accepted as a reasonably reliable method of restoring a person's memory. Consequently, hypnotically-induced testimony may be admissible if the proponent of the testimony can demonstrate that the use of hypnosis in the particular case was a reasonably reliable means of restoring memory comparable to normal recall in its accuracy.

A review of the evidence concerning the nature of the phenomenon and its effect on recall and a comparison of this evidence to the problems associated with normal recall support our conclusion.

The experts who testified below and other authorities agree that hypnosis is not a useful tool for ensuring the accuracy of a subject's recall. *E. g.*, Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 *Cal.L.Rev.* 313, 335 (1980) [hereinafter cited as Diamond]; Orne, *The Use and Misuse of Hypnosis in Court*, 27 *Int. J. Clinical & Experimental Hypnosis* 311, 317–18 (1979) [hereinafter cited as Orne]; Spector & Foster, *supra*, at 584; Spiegel, *Hypnosis and Evidence: Help or Hindrance?*, 347 *Annals N.Y. Acad. Sci.* 73, 79 (1979). The authorities state that while hypnosis often can produce remarkably accurate recall, it is also prone to yield sheer fantasy, willful lies, or a mixture of fact with gaps filled in by fantasy. Dr. Orne, one of the defense experts and a leading researcher, describes the problem in the following terms:

> The hypnotic suggestion to relive a past event, particularly when accompanied by questions about specific details, puts pressure on the subject to provide information for which few, if any, actual memories are available. This situation may jog the subject's memory and produce some increased recall, but it will also cause him to fill in details that are plausible but consist of memories or fantasies from other times. It is extremely difficult to know which aspects of hypnotical-

ly aided recall are historically accurate and which aspects have been confabulated.... Subjects will use prior information and cues in an inconsistent and unpredictable fashion; in some instances such information is incorporated in what is confabulated, while in others the hypnotic recall may be virtually unaffected.

As a consequence of these limitations, hypnosis may be useful in some instances to help bring back forgotten memories following an accident or a crime while in others a witness might, with the same conviction, produce information that is totally inaccurate.... As long as this material is subject to independent verification, its utility is considerable and the risk attached to the procedure minimal. There is no way, however, by which anyone—even a psychologist or psychiatrist with extensive training in the field of hypnosis—can for any particular piece of information determine whether it is an actual memory versus a confabulation *unless* there is independent verification. [Orne, *supra*, at 317–18 (emphasis in original)]

Several features of the hypnotic experience explain why hypnosis, unless carefully controlled, is not generally accepted as a reliable means of obtaining accurate recall. First, a person undergoing hypnosis is extremely vulnerable to suggestions. In describing the events he is reliving, he will tend to shape his "recall" in response to intentional or inadvertent cues from the questioner. These cues may be as obvious as leading questions or as subtle as the inflection of the questioner's voice or degree of apparent approval by the hypnotist. Diamond, *supra*, at 333; Orne, *supra*, at 318, 326. In addition, a subject often will incorporate into his response his notion of what is expected of him. Authorities note that there are particular problems of suggestibility when the subject is aware of a preferred response or when the examiner has a preconceived theory that is likely to influence his questioning. *Id.* at 322. Because of the unpredictability of what will influence a subject, it is difficult even for an expert examining a videotape of a hypnotic session to identify possible cues. Diamond, *supra*, at 339.

A second aspect of hypnosis that contributes to its unreliability is the loss of critical judgment. A person under hypnosis is more willing to speculate and will respond to questions with a confidence he would not have as a waking person. Orne, *supra*, at 319.

The third and perhaps most troubling phenomenon is the tendency to confound memories evoked under hypnosis with prior recall. *See* Diamond, *supra,* at 333–34, 335–36; Orne, *supra,* at 320. Typically a subject is told that he will remember what he has recalled under hypnosis after he awakes from the trance. In response to this post-hypnotic suggestion, most subjects will indiscriminately mix their hypnotic recall together with their waking memory. Many experts believe that the subject is then unable to evaluate critically the resulting memory to determine what he himself believes is the accurate version.[2] *See* Diamond, *supra,* at 335–36; Orne, *supra,* at 318–320. Furthermore, he will have strong subjective confidence in the validity of his new recall, which will make it difficult for an expert or a jury to judge the credibility of his memory. Diamond, *supra,* at 339–40; Orne, *supra,* at 320; Spector & Foster, *supra,* at 593.

The inherent limitations on hypnosis as a method for obtaining completely accurate recall have led the dissenting members of our Court and some other courts to conclude that the testimony of a witness whose memory has been enhanced through hypnosis is never admissible in a criminal trial. *Mena, supra; Mack, supra.* *See also* Diamond, *supra,* at 348–49. The Supreme Court of Minnesota explained its conclusion as follows:

> However, the fact that a witness' memory results from hypnosis bears on the question of whether her testimony is sufficiently competent, relevant, and more probative than prejudicial, to merit admission at all. The crux of the problem is that hypnosis can create a memory of perceptions which neither were nor could have been made, and, therefore, can bring forth a "memory" from someone who cannot establish that she perceived the events she asserts to remember. Neither

---

[2]Dr. Spiegel testified that his experience leads him to believe that there is a return of critical judgment concerning the material uncovered through hypnosis. In his opinion, the post-hypnotic session is useful for allowing the subject to accept or reject his hypnotic recall. This theory is not reflected in the article by Dr. Spiegel, submitted by the State at trial, in which he used the facts of this case as an illustration but nowhere indicated that the potential for suggestiveness during the trance would be alleviated by the exercise of critical judgment afterwards. Spiegel, *supra,* at 76, 79.

the person hypnotized nor the expert observer can distinguish between confabulation and accurate recall in any particular instance. After the hypnosis session, the hypnotically "retrieved" account differs in another way from ordinary human recall, to which the state seeks to liken it. Because the person hypnotized is subjectively convinced of the veracity of the "memory," this recall is not susceptible to attack by cross-examination. [*Mack, supra,* 292 *N.W.*2d at 769-70 (footnote omitted)]

Although we share the dissent's concern about the possible contamination of a witness' memory, we believe that a rule of *per se* inadmissibility is unnecessarily broad and will result in the exclusion of evidence that is as trustworthy as other eyewitness testimony. Without underestimating the seriousness of the problems associated with hypnosis, it should be recognized that psychological research concerning the reliability of ordinary eyewitnesses reveals similar shortcomings. *See generally* Marshall, Marquis & Oskamp, *Effects of Kind of Question and Atmosphere of Interrogation on Accuracy and Completeness of Testimony,* 84 *Harv.L.Rev.* 1620 (1971); Levine & Tapp, *The Psychology of Criminal Identification,* 121 *U.Pa.L.Rev.* 1079 (1973); Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification,* 29 *Stan.L.Rev.* 969 (1977) [hereinafter cited as *Unreliability of Eyewitness identification*]. Studies indicate that memory does not merely reproduce perceptions of an event; "memory, like perception, is an active, constructive process that often introduces inaccuracies by adding details not present in the initial representation or in the event itself. The mind combines all the information acquired about a particular event into a single storage 'bin,' making it difficult to distinguish what a witness saw originally from what she learned later." *Unreliability of Eyewitness Identification, supra,* at 983. This undetectable, unconscious confabulation often consists of filling in gaps in memory so that the total picture will make sense or conform to the subject's subconscious expectation of what must have occurred. *Id.* at 980, 983.

Further distortion occurs in the interrogation process. Because the most accurate method of recall—an unprompted nar-

rative—typically results in an incomplete description, there is a tendency for interrogators to resort to more precise questions. But, specific questions yield less accurate responses, because a witness feels pressured to answer in spite of gaps in his recollection. Marshall *et al., supra,* 84 *Harv.L.Rev.* at 1629. Furthermore, such things as the intonation of the examiner's voice or gestures by him often will provide unwitting cues to the witness concerning the examiner's expectation. *Unreliability of Eyewitness Identification, supra,* at 988. These suggestions transmitted during the interrogation process have been found to affect not only the witness' immediate answer but also his subsequent recollection of the event. *Id.* at 984.

Finally, the ordinary procedural safeguards, including cross-examination and the opportunity to observe a witness' demeanor are often inadequate to reveal the subtle distortions in a witness' memory. Research has shown that "witnesses—particularly victims—often become more confident of the correctness of their identification as time progresses," in spite of the natural tendency of memory to decay. *Id.* at 985. This false confidence in the details of one's memory, especially when it satisfies a personal need to know and is reinforced through repeated interrogation, imparts an impression of credibility to the jury that is difficult for an adversary to undermine through cross-examination. In addition, because the witness himself generally is unaware of the changes in his memory over time, *id.* at 983, 995, his reputation for honesty and innate critical judgment cannot be counted on to reveal any inaccuracy.

The fallibility of human memory poses a fundamental challenge to our system of justice. *See* Kubie, *Implications for Legal Procedure of the Fallibility of Human Memory,* 108 *U.Pa. L.Rev.* 59 (1959); *Unreliability of Eyewitness Identification, supra.* Nevertheless, it is an inescapable fact of life that must be understood and accommodated. Rather than require historical accuracy as a condition for admitting eyewitness testimony, we depend on the adversary system to inform the jury of the

inherent weaknesses of evidence. *See Manson v. Brathwaite*, 432 *U.S.* 98, 116, 97 *S.Ct.* 2243, 2253, 53 *L.Ed.2d* 140 (1977).

As the trial court found, the experts who testified at trial indicated that in appropriate cases and where properly conducted the use of hypnosis to refresh memory is comparable in reliability to ordinary recall. Therefore, we hold that testimony enhanced through hypnosis is admissible in a criminal trial if the trial court finds that the use of hypnosis in the particular case was reasonably likely to result in recall comparable in accuracy to normal human memory. If the testimony is admissible, the opponent may still challenge the reliability of the particular procedures followed in the individual case by introducing expert testimony at trial, but the opponent may not attempt to prove the general unreliability of hypnosis. The trier of fact must then decide how much weight to accord the hypnotically refreshed testimony.

## IV

Whenever a party in a criminal trial seeks to introduce a witness who has undergone hypnosis to refresh his memory, the party must inform his opponent of his intention and provide him with the recording of the session and other pertinent material.[3] The trial court will then rule on the admissibility of the testimony either at a pretrial hearing or at a hearing out of the jury's presence. In reviewing the admissibility of hypnotically refreshed testimony, the trial court should evaluate both the kind of memory loss that hypnosis was used to restore and the specific technique employed, based on expert testimony presented by the parties. The object of this review is not to determine whether the proffered testimony is accurate, but instead whether the use of hypnosis and the procedure followed in the particular case was a reasonably reliable means of restoring the witness' memory.

---

[3]The defendant may be constitutionally entitled to this material. *United States v. Miller*, 411 *F.2d* 825 (2d Cir. 1969).

The first question a court must consider is the appropriateness of using hypnosis for the kind of memory loss encountered. The reason for a subject's lack of memory is an important factor in evaluating the reliability of hypnosis in restoring recall. According to defendant's expert, Dr. Orne, hypnosis often is reasonably reliable in reviving normal recall where there is a pathological reason, such as a traumatic neurosis, for the witness' inability to remember.[4] Orne, *supra*, at 325. On the other hand, the likelihood of obtaining reasonably accurate recall diminishes if hypnosis is used simply to refresh a witness' memory concerning details where there may be no recollection at all or to "verify" one of several conflicting accounts given by a witness. *Id.* at 324, 332. A related factor to be considered is whether the witness has any discernible motivation for not remembering or for "recalling" a particular version of the events. In either case, the possibility of creating self-serving fantasy is significant. *See id.* at 314–15; Spiegel, *supra*, 347 *Annals N.Y.Acad.Sci.* at 76.

Once it is determined that a case is of a kind likely to yield normal recall if hypnosis is properly administered, then it is necessary to determine whether the procedures followed were reasonably reliable. Of particular importance are the manner of questioning and the presence of cues or suggestions during the trance and the post-hypnotic period. "Considerable experience in the clinical and forensic use of age regression and related techniques suggests that the patient has a higher likelihood of producing uncontaminated memories if allowed to initially relive the events without much questioning by the hypnotist. Further details can then be elicited by questioning the second or third time the material is brought forth." Orne, *supra*, at 325. *See*

---

[4]We do not mean to suggest that hypnosis is inappropriate for refreshing memory where there is no pathological reason for a subject's lack of recall. Hypnosis remains a valuable tool for developing leads for investigation. However, the reliability of hypnosis in such cases is questionable. Therefore, its usefulness in eliciting admissible testimony should be especially carefully evaluated by the trial court in such cases.

*also* Putnam, *Hypnosis and Distortions in Eyewitness Memory*, 27 *Int.J. Clinical & Experimental Hypnosis* 437, 444–46 (1979). An additional factor affecting the reliability of the procedures is the amenability of the subject to hypnosis, since some experts believe that subjects capable of entering deeper trances are usually more suggestible. None of these factors should be considered absolute prerequisites to admissibility, nor are they exclusive. They are listed to illustrate the nature of the inquiry.

To provide an adequate record for evaluating the reliability of the hypnotic procedure, and to ensure a minimum level of reliability, we also adopt several procedural requirements based on those suggested by Dr. Orne and prescribed by the trial court, 173 *N.J.Super.* at 363. Before it may introduce hypnotically refreshed testimony, a party must demonstrate compliance with these requirements.

First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. This professional should also be able to qualify as an expert in order to aid the court in evaluating the procedures followed. Although we recognize that there are many other people trained to administer hypnosis and skilled in its use for investigative purposes, we believe that a professional must administer hypnosis if the testimony revealed is to be used in a criminal trial. In this way, the court will be able to obtain vital information concerning the pathological reason for memory loss and the hypnotizability of the witness. Furthermore, the expert will be able to conduct the interrogation in a manner most likely to yield accurate recall.

Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense.[5] This condition will safeguard against any bias on the part of the hypnotist that might translate into leading questions, unintentional cues, or other suggestive conduct.

---

[5]Of course, the hypnotist may collect a fee from the party who engaged his services.

Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form. This requirement will help the court determine the extent of information the hypnotist could have communicated to the witness either directly or through suggestion.

Fourth, *before* inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. The hypnotist should carefully avoid influencing the description by asking structured questions or adding new details.

Fifth, all contacts between the hypnotist and the subject must be recorded. This will establish a record of the pre-induction interview, the hypnotic session, and the post-hypnotic period, enabling a court to determine what information or suggestions the witness may have received during the session and what recall was first elicited through hypnosis. The use of videotape, the only effective record of visual cues, is strongly encouraged but not mandatory.

Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the post-hypnotic interview. Although it may be easier for a person familiar with the investigation to conduct some of the questioning, the risk of undetectable, inadvertent suggestion is too great, as this case illustrates. Likewise, the mere presence of such a person may influence the response of the subject.

Once compliance with these safeguards is shown, the trial court can determine the reliability and therefore the admissibility of hypnotically refreshed testimony, according to the standard set forth above.

Concerning the burden of proof, we agree with the trial court that the party seeking to introduce hypnotically refreshed testimony has the burden of establishing admissibility by clear and convincing evidence. We recognize that this standard

places a heavy burden upon the use of hypnosis for criminal trial purposes.[6]  This burden is justified by the potential for abuse of hypnosis, the genuine likelihood of suggestiveness and error, and the consequent risk of injustice.  Hypnotically refreshed testimony must not be used where it is not reasonably likely to be accurate evidence.  The burden of proof we adopt here will assure strict compliance with the procedural guidelines set forth in this opinion.  It will also limit the admissibility of this kind of evidence to those cases where a party can convincingly demonstrate that hypnosis was a reasonably reliable means of reviving memory comparable in its accuracy to normal recall.

### V

In cases like the present one, where the use of hypnosis results in a subsequent out-of-court or in-court identification of the defendant, the defendant may also challenge on constitutional grounds the admissibility of testimony concerning the identification.  The Supreme Court has held that an in-court identification following a pretrial identification procedure must be excluded if the pretrial proceeding was "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to amount to a violation of due process.  *Stovall v. Denno*, 388 *U.S.* 293, 302, 87 *S.Ct.* 1967, 1972, 18 *L.Ed.*2d 1199 (1967). The Court has elaborated on this rule by stating that "reliability is the linchpin in determining the admissibility of identification testimony."  *Manson v. Brathwaite*, 432 *U.S.* 98, 114, 97 *S.Ct.* 2243, 2253, 53 *L.Ed.*2d 140 (1977).  In determining whether introduction of identification testimony would violate due process, the corrupting effect of the suggestive identification is

---

[6]Because the stakes are less in a civil proceeding, we do not decide whether a party must establish the reliability of hypnotically enhanced testimony by clear and convincing evidence as a condition for admissibility.  Nor do we decide whether all of the procedural requirements set forth below would be necessary.  As a minimum, however, we believe that a recording of the session is essential; otherwise the opponent will have no effective way to challenge the credibility of the testimony at trial.

weighed against the factors set out in *Neil v. Biggers, supra,* 409 *U.S.* at 199, 93 *S.Ct.* at 382, indicating the accuracy of the identification. *Manson v. Brathwaite, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253.

The defendant ordinarily bears the burden of demonstrating by a preponderance of the evidence that the pretrial identification was so suggestive as to result in a substantial likelihood of misidentification. *E.g., State v. Cooper,* 165 *N.J.Super.* 57, 66 (App.Div. 1979). Nevertheless, because of the inherent problems of hypnosis, the trial court below imposed on the State the burden of showing by clear and convincing evidence a lack of impermissible suggestiveness as well as reliability under the totality of circumstances. 173 *N.J.Super.* at 364, 369. We do not believe it is necessary to depart from the normal assignment of burdens on the constitutional question.

In most cases, the due process inquiry will be closely related to the threshold determination of admissibility. If the hypnotically refreshed testimony is inadmissible because of its unreliability, there will be no need to consider the due process issue. Conversely, it is difficult to imagine that an identification would violate due process once the court has determined that the testimony satisfies the more stringent standard for reliability we have established today. Since the State bears the burden of demonstrating reliability by clear and convincing proof, any other showing of suggestiveness amounting to a constitutional violation should be the burden of the defendant.

VI

Turning to the present case, we find, as did the trial court, that the State has failed to meet its burden of establishing the admissibility of the proffered identification by clear and convincing evidence. First, we note that the procedural requirements set forth above were not satisfied. In particular, there is no record of what Dr. Spiegel knew about the case before the session; there is no statement of what Mrs. Sell remembered

prior to undergoing hypnosis; the pre-hypnotic session was not recorded; and law enforcement personnel were present during the session. If our only concern was the failure to observe these procedures, we might not require suppression of the testimony, because the State could not have anticipated the details of the required procedures. Furthermore, the purpose of creating a record of the session has been substantially satisfied. But, the procedures followed in this case raise grave doubts about the reliability of the hypnotically refreshed testimony obtained, which renders that testimony inadmissible.

The most troubling aspect of the session was the role played by Detective Pierangeli. Not only was she present during the session, but she asked specific questions, such as "Is it Paul?" This form of questioning, together with the pressure she exerted on Mrs. Sell to cooperate by making an identification, raises the real possibility of suggestiveness. The suggestiveness continued during the post-hypnotic session, when the trial court found that the officer and Dr. Spiegel encouraged Mrs. Sell to overcome her doubts about the identification she had made, rather than let her evaluate the hypnotically induced recall critically. Detective Pierangeli continued to encourage Mrs. Sell afterwards at dinner. The unreliability and suggestiveness of this conduct is manifest. Moreover, Mrs. Sell's identification has not been corroborated by any other evidence. Based on these facts, we cannot find that the State has shown, by clear and convincing evidence, that hypnosis as performed in this case was a reasonably reliable means of yielding normally accurate recall. Because the State has failed to demonstrate that the use of hypnosis in this case was sufficiently reliable to allow Mrs. Sell's testimony to be admitted, we need not consider defendant's due process argument.

For the reasons stated above, we affirm the judgment of the trial court precluding the proposed in-court identification of defendant.

SULLIVAN, J., concurring in the result.

Hypnosis can be a valuable investigative tool for law enforcement authorities. However, I would not allow the use of hypnotically induced identification testimony against a defendant in a criminal trial. To do so would have the defendant's innocence or guilt depend on the jury's speculating, on the basis of conflicting scientific-medical testimony, whether the identification was true recollection or implanted by the hypnosis. My conclusion is aptly summarized in a law review article which is cited in the majority opinion. The author is Professor Diamond, who is both a professor of law at the University of California at Berkeley and a clinical professor of psychiatry at the same university at San Francisco. In his article, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 *Cal.L.Rev.* 313 (1980), he states:

> I believe that once a potential witness has been hypnotized for the purpose of enhancing memory his recollections have been so contaminated that he is rendered effectively incompetent to testify. Hypnotized persons, being extremely suggestible, graft onto their memories fantasies or suggestions deliberately or unwittingly communicated by the hypnotist. After hypnosis the subject cannot differentiate between a true recollection and a fantasy or a suggested detail. Neither can any expert or the trier of fact. This risk is so great, in my view, that the use of hypnosis by police on a potential witness is tantamount to the destruction or fabrication of evidence. [68 *Cal.L.Rev.* at 314]

Because of the inherent unreliability of hypnotically induced identification testimony, I would bar its use against a defendant in a criminal trial.

Justice CLIFFORD joins in this opinion.

SULLIVAN and CLIFFORD, JJ., concurring in the result.

*For affirmance*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For reversal*—None.